321 Ga. 434
FINAL COPY

S25A0263. ARNOLD v. THE STATE.

LaGrua, Justice.

Appellant Alfred Jermaine Arnold appeals his convictions for malice murder and other crimes related to the death of Loretta Goolsby.[1] On appeal, Arnold argues that his convictions should be reversed based on the following contentions: (1) the evidence was insufficient to support the verdicts in this case; (2) either Arnold's discovery rights were violated or his trial counsel was

---

[1] Goolsby was beaten to death on or about April 5 to 6, 2019. On March 3, 2020, a Rockdale County grand jury indicted Arnold for the following counts: malice murder (Count 1); felony murder predicated on aggravated assault (Count 2); aggravated assault (Count 3); arson in the third degree (Count 4); and theft by taking (Count 5). Arnold was tried from June 20 to 23, 2023, and the jury found Arnold guilty on all counts. The trial court sentenced Arnold to life without the possibility of parole on Count 1 (malice murder), plus six years to run concurrently on Count 4 (arson in the third degree) and Count 5 (theft by taking). The remaining counts merged or were vacated by operation of law. Arnold filed a timely motion for new trial, which he later amended through new counsel on March 27, 2024. After holding an evidentiary hearing on the motion for new trial, the trial court denied the motion on August 8, 2024. Arnold filed a timely notice of appeal to this Court, and the case was docketed to the term beginning in December 2024 and submitted for a decision on the briefs.

constitutionally ineffective regarding the admission of a fingerprint match between Arnold and an item collected at the scene because Arnold "was not properly informed of the [State's] expert witness nor the report of that witness prior to trial"; and (3) the trial court erred by admitting the State's material analyst as an expert under the *Daubert*[2] standard and OCGA § 27-7-702 (b). For the reasons that follow, we affirm Arnold's convictions.

The evidence presented at trial showed that, between the night of April 5 and the early morning hours of April 6, 2019, 58-year-old Goolsby was beaten to death[3] in the home she rented at 1415 Lester Road in Conyers. Goolsby's body was discovered on April 12, 2019, when Dennis Lester, who lived in the house next to Goolsby's, went to check on her.[4] After noting that the house was quiet and the front

---

[2] See *Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. 579 (113 SCt 2786, 125 LE2d 469) (1993).

[3] At trial, the medical examiner testified that Goolsby "had a total of seventeen lacerations, including on her face, around her eyes, on the top of her scalp, on the sides of her scalp, and on the back of her scalp," and she had lacerations on "each of her arms" and her "right shin" that were "consistent with defensive type injuries." The medical examiner concluded that Goolsby died from "the blunt force injuries, particularly the injuries to the head," and may have been dead "as many as six or seven days" when she was found.

[4] Lester's brother owned the house Goolsby rented, and Lester testified

and back doors were locked, Lester contacted law enforcement to request a "welfare check."

An officer with the Rockdale County Sheriff's Office ("RCSO") responded to Lester's call, and after obtaining permission from the homeowner, the officer and Lester entered the house and forced open the door to Goolsby's bedroom, which was locked. The bedroom had "a very foul odor"; the furnishings were covered in a "powdery substance"; and "clothes and sheets" were piled on the floor. They stepped further inside the bedroom, and on the floor, they observed "somebody's foot" with "decomposed toes" "sticking out" from a body "covered up with a whole bunch of clothing." The officer then "contacted radio and let them know what [she] had."

RCSO Investigator Brandi Jones responded to the scene and, after obtaining a search warrant, entered Goolsby's house[5] and

that he had become concerned about Goolsby because she had not paid her rent; he had not seen her "going in and out like she usually [did]"; and her "small gray" car had not been parked outside her house for several days.

[5] Investigator Jones video-recorded and photographed the interior of Goolsby's house, including Goolsby's bedroom, and those recordings and photographs were admitted into evidence during trial.

looked inside her bedroom, noting it was "covered in . . . a yellowish white dust" that was "very, very thick." Investigator Jones testified that, based on a prior experience, she realized "some type of a fire extinguisher retardant . . . was all over the room." Investigator Jones started removing "clothing and items" from the bedroom floor until she uncovered Goolsby's body between the dresser and the bed.[6] Investigator Jones noted that the bottom of the mattress in Goolsby's bedroom appeared to have been burned, as did the floor around it, and there were burns on Goolsby's back and the T-shirt she was wearing. Investigator Jones also noticed a "large amount of blood spatter that was located on the wall adjacent to the mattress, the foot of the mattress." Investigator Jones testified that she collected a sample of the retardant-like substance that was covering the surfaces in Goolsby's bedroom, as well as a "car jack that was located underneath the clothing" close to Goolsby's body. The medical examiner testified that this car jack "could have caused [Goolsby's] injuries," as she had an "L-shaped laceration" on the top

---

[6] The coroner pronounced Goolsby dead at the scene on April 12.

of her head "which suggested a corner configuration." Investigator Jones also located and collected an open container of "blue Majik hair gel" that was sitting on top of the mattress. She testified that there was "[n]o yellow substance" on this hair gel container, "inside or out," and that they were able to lift latent fingerprints off the open hair gel container.

During a search of the other bedroom in the house, Investigator Jones collected a bag from the closet containing a T-shirt stained with blood that was later revealed to be Goolsby's. In the kitchen, next to the stove, Investigator Jones located and collected a fire extinguisher, which had its pin removed and appeared to have "a mixture of blood and retardant" on it. She then also observed and collected a "silver in color pin kind of clip" from the "rug in front of the [kitchen] sink." Investigator Jones testified that she swabbed "most every surface in the house for DNA," which swabs were collected and "sent to the [GBI] for further processing."

RCSO Investigators Grote Levett and Dylan Hinds testified that they spoke to Lester on April 12, and he indicated that Goolsby

often hung out at a "liquor house" in Conyers located at 1091 Adcock Circle.[7] Lester also told the investigators that Goolsby had recently gotten a "roommate" — later determined to be Arnold — who did not own a car. Lester then mentioned "a male friend" of Goolsby's named Robert Ruley, who also hung out at 1091 Adcock Circle and drove a "light in color" Ford "[p]ick-up truck" that Lester had recently seen at Goolsby's house. Based on the description of this vehicle, the investigators reviewed images from "license plate readers" in the area to see if any matching vehicles had been photographed over the past several weeks. One of the license plate readers "picked up" the tan Ford pick-up truck Lester described, and after running the tag number, the vehicle registration "came back to Robert Ruley."

On April 12, RCSO investigators located Ruley at 1091 Adcock Circle and transported him to the RCSO for an interview. One of the interviewing officers testified that, although Ruley was "clearly

---

[7] At trial, 1091 Adcock Circle was described as a place where "a lot of people that grew up together" would "sit around," "[p]lay cards, drink beer," and "[l]isten to music."

intoxicated" when they interviewed him, he revealed to them that Arnold had rented a room at Goolsby's house for "a week or two."

At trial, Ruley testified that he learned about Goolsby's death for the first time when law enforcement officers showed up at 1091 Adcock Circle on April 12. Ruley said he had not realized Goolsby was missing because she only "popped up" at Adcock Circle "every now and then."[8] According to Ruley, in March 2019, he introduced Goolsby to Arnold when they were hanging out at 1091 Adcock Circle. Ruley and Arnold worked together at the same company, and because Arnold was not from the area, Ruley brought him to Adcock Circle and introduced him to "everybody." Ruley had learned Arnold needed a place to stay, and Ruley knew Goolsby "had an extra room" in her house and "needed help with money." Goolsby agreed to let Arnold rent her extra bedroom. Ruley testified that Arnold lived with Goolsby for "about a week or two weeks," and during that time,

---

[8] Ruley testified that he and Goolsby first met at 1091 Adcock Circle, and she then became a friend with whom he would "have sex" "[e]very now and then."

Ruley would pick Arnold up for work "[m]ostly every day" in Ruley's "'94 Ford F-150" because Arnold "did not have a car."

Ruley testified that, on the morning of April 6, Arnold showed up at 1091 Adcock Circle and told Ruley "he had been kicked out" of Goolsby's house and had "nowhere to stay." According to Ruley, he and Arnold hung out that day at 1091 Adcock Circle, and that night, they slept in the front seat of Ruley's truck. Ruley testified that, the next day — April 7 — he took Arnold "to see his mom" at the "Food Depot in Stockbridge," driving "the F-150."[9] Ruley testified that Arnold got into his mother's car, "drove off," and "that was the last time" Ruley saw or spoke to Arnold.

Further testimony about Arnold's activities on April 6 and 7 came from his mother, Richetta Arnold. Richetta testified that, on April 5 or 6 — she could not recall the exact date — Arnold called her and asked her to drive to Conyers from her apartment in Morrow

_____

[9] Surveillance videos from the Food Depot in Stockbridge, which were admitted through the testimony of a Food Depot employee and one of the lead investigators at trial, confirmed that, around 9:30 a.m. on April 7, Ruley drove Arnold to meet his mother at this Food Depot in Ruley's tan Ford F-150 pick-up truck.

to "pick up his clothes." Around 10:00 a.m. on April 6, Richetta picked up Arnold at 1091 Adcock Circle,[10] and Arnold directed her to an abandoned house on Bryant Street, which was "walking distance" from 1091 Adcock Circle, where he retrieved "a couple of bags and a little small suitcase" from the porch of the house and put them in Richetta's car. According to Richetta, Arnold told her that he had been kicked out of the house where he had been staying and had taken an Uber[11] to the abandoned house where he "dropped off the clothes." After retrieving Arnold's clothes, Richetta took Arnold back to 1091 Adcock Circle, and she returned to Morrow. The next day, April 7, Richetta met Arnold and his friend "Rob" at a "Food Depot in Stockbridge," and she drove him back to Morrow, where he stayed for about "a week." Richetta testified that Arnold did not have a car, did not drive, and did not "even have a license."

---

[10] Ruley did not mention in his testimony that Arnold briefly left 1091 Adcock Circle with his mother on the morning of April 6.

[11] RCSO investigators obtained a court order to review any records from Uber demonstrating that Arnold utilized their services during this timeframe, but they were unable to obtain any records confirming the same.

Officer Nicolas Luke with the Conyers Police Department testified that, on April 8, he was asked to "respond to a report of an abandoned vehicle" on Bryant Street.[12] When Officer Luke "arrived on the scene," he observed a vehicle "off in the woods from Bryant Street," across the street from "two old[,] abandoned houses." Officer Luke approached the vehicle, ran the tag number, and determined that the vehicle belonged to Goolsby.[13]

On April 12, Investigator Hinds traveled to Arnold's mother's apartment in Morrow to speak with her about her son, and Richetta gave him permission to search the apartment. Investigator Hinds collected a "black duffel bag" from the apartment, which he brought back to the RCSO to be processed. Investigator Jones testified that she processed the contents of the duffel bag, which included a pair

---

[12] Officer Luke was wearing a body camera that day, and the video footage from his body camera was admitted at trial and played for the jury.

[13] The vehicle was towed to the RCSO, and after obtaining a search warrant, RCSO investigators searched the vehicle and recovered "some clothing," a "work identification" card for Goolsby, and a set of keys that included "car keys to the vehicle."

of shoes and a black glove that had been "shoved up" inside the left shoe.

The palm of the black glove recovered from Arnold's shoe was covered in a thick, light-colored substance, which was submitted to Casey Jarvis, an expert in materials analysis, for testing, along with the sample of the retardant-like powder Investigator Jones collected at the crime scene. Jarvis concluded — after determining that the source of the powder was a fire extinguisher — that the powder "on the glove" and "in the powder sample" were "chemically similar." She further concluded that "the white powdery substance" found on the glove was "optically similar" to the white "powdery substance" in the sample. Jarvis was "also asked to look at a car jack" recovered at the crime scene and to compare "the surface material on the car jack" with "material that was collected from the victim's wounds." Jarvis concluded that the material from the car jack she "analyzed as part of [her] research" matched the material found in the swabs from Goolsby's wounds.

On April 13, Investigator Levett and RCSO Corporal Charles Dixon traveled to Valdosta to talk to Arnold,[14] and after being advised of and waiving his *Miranda*[15] rights, Arnold agreed to talk about this case with the investigators. During that interview, which was audio-recorded, Arnold admitted that he lived with Goolsby at 1415 Lester Road for a week or two from the end of March to early April 2019. Arnold said that he had been without a place to stay, and Ruley — whom he worked with — helped him find housing with Goolsby.

According to Arnold, on the morning of Friday, April 5, Goolsby took him to work, and later that afternoon, he met her at a package store, where they purchased alcohol and returned to the house at 1415 Lester Road. Arnold said that Goolsby went over to 1091 Adcock Circle that evening, and she returned home about "seven or eight," having called him a couple times to say she was "on the way."

---

[14] Evidence presented at trial demonstrated that Arnold went to visit family in Valdosta on or about April 12.

[15] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

Arnold told the investigators that, when Goolsby returned from Adcock Circle, she "bang[ed] on" his bedroom door and started "going on about" how Arnold was "running up" the power bill and "using too much lights." Arnold said he and Goolsby had a "bit of a confrontation," at which point he saw the "shadow figure" of a man behind Goolsby, who went into her bedroom.[16]

Arnold stated that, after this confrontation, Goolsby kicked him out of the house, and Arnold started "grabbing his belongings." Arnold went out to the front porch and "immediately" called Ruley to say that Goolsby had kicked him out of the house.[17] A few minutes later, Goolsby came outside and asked Arnold, "what you still doing here?" Goolsby then said, "get out of here," and Arnold picked up his bags and started "walking down the driveway to Lester Road." Arnold said "somebody" picked him up and took him to 1091 Adcock Circle. Arnold told the investigators that, when he arrived at Adcock

---

[16] Arnold did not give the investigators much detail about this man other than to describe him as "heavyset" and "bald." Arnold said he did not know the man or his name.

[17] Arnold said that Ruley was not surprised Goolsby had kicked him out and thought Goolsby wanted "to have sex" with Arnold.

Circle, he washed all his clothes, and his mother came to Conyers the next day to pick up his clothes at 1091 Adcock Circle. Arnold said he did not leave Conyers with his mother, but stayed with Ruley "all Saturday," sleeping in Ruley's truck "Saturday night in front of Adcock Circle." On Sunday morning, Ruley took Arnold to "the Food Depot in Stockbridge" to meet his mother.

The investigators advised Arnold that they had spoken to his mother, and she said the clothes she picked up for Arnold were located at "an old, rundown" "abandoned house off of Bryant Street," not at 1091 Adcock Circle as Arnold had indicated. The investigators also informed Arnold that the abandoned house where he deposited his clothes "just happened to be" across the street from the location where Goolsby's car was discovered by law enforcement. At that point, Arnold changed his account slightly, stating that, when he got a ride from Goolsby's house on the night of April 5, he "dropped off his clothes at this abandoned location at Bryant Street before going to Adcock Circle." Arnold then composed a written statement memorializing his verbal account. Arnold was permitted to leave

14

after this interview, but agreed to give his cell phone to Investigator Levett.

RCSO Investigator Thomas Green testified that, after obtaining a search warrant, he conducted a search of Arnold's cell phone in "two parts." "The first part was a search of [location] information that was on the phone itself," after which he "utilized Google timeline to search the historical location information on th[e] phone."[18] "The second part" involved the use of a program to "extract raw data" from Arnold's phone, including "text messages" and "call logs."

According to Investigator Green, the location information he received and reviewed from Arnold's cell phone for the period between the afternoon of April 5 and the morning of April 7 demonstrated that Arnold's cell phone was located at 1415 Lester Road starting at 4:43 p.m. on Friday, April 5. Between 1:06 a.m. and

---

[18] Investigator Green explained that the program he used to analyze the location data detected whether, when the person in possession of the cell phone moved from one location to another, the person was traveling in a vehicle or walking.

15

1:29 a.m. on Saturday, April 6, Arnold's phone traveled from 1415 Lester Road to the Bryant Street area and 1091 Adcock Circle. Between 3:27 a.m. and 4:02 a.m., Arnold's phone traveled from the Bryant Street area back to 1415 Lester Road. Between 8:57 a.m. and 9:16 a.m., Arnold's phone traveled back to the Bryant Street area, at which point it was in possession of someone walking to 1091 Adcock Circle, arriving at 9:31 a.m. At 10:31 a.m., Arnold's phone traveled to the Bryant Street area,[19] returning to 1091 Adcock Circle at 10:42 a.m. Arnold's phone primarily remained at 1091 Adcock Circle from 10:42 a.m. on April 6, until 9:08 a.m. on Sunday, April 7, when Arnold's phone traveled from 1091 Adcock Circle to the Food Depot in Henry County.

Corporal Dixon testified that, after speaking with Arnold on April 13 and reviewing the "location data from his phone," the investigators noted "a number of inconsistencies," particularly with respect to Arnold's account of what occurred between the hours of

---

[19] Richetta testified that, around this time, she picked Arnold up at 1091 Adcock Circle and drove him to an abandoned house on Bryant Street to pick up his clothes.

8:00 p.m. on Friday, April 5—the approximate time Arnold said he got into a confrontation with Goolsby, she kicked him out, and he never "went back"—and 8:57 a.m. on April 6, when Arnold's phone was still located at 1415 Lester Road. According to Corporal Dixon, they reviewed surveillance videos from the package store where Arnold said he met Goolsby,[20] which confirmed that Goolsby and Arnold were present at the store around 4:30 p.m. on April 5, as well as surveillance videos from the Food Depot in Stockbridge, which confirmed that Ruley gave Arnold a ride to meet his mother at that location around 9:30 a.m. on April 7.

Corporal Dixon also reviewed surveillance videos from a business located across the street from 1415 Lester Road with multiple surveillance video cameras installed on the exterior of its property.[21] The business's surveillance videos demonstrated that a vehicle matching Goolsby's left 1415 Lester Road at 4:24 p.m. on

---

[20] Surveillance videos from the package store were admitted at trial through the testimony of the manager and Corporal Dixon.

[21] Surveillance videos from this business were admitted at trial through the testimony of its facility manager and Corporal Dixon.

April 5 and returned at 4:40 p.m. The same vehicle left 1415 Lester Road at 6:54 p.m. on April 5 and returned at 8:52 p.m. The headlights of a vehicle were captured leaving 1415 Lester Road at 1:24 a.m. on April 6, returning at 3:45 a.m. A vehicle matching Goolsby's then left 1415 Lester Road at 9:04 a.m. on April 6 and did not return. The surveillance videos from the business did not show anyone walking away from 1415 Lester Road on the night of April 5 or Ruley's truck "coming through Lester Road at any point in that April 5, April 6 time period."

Corporal Dixon testified that they also reviewed Goolsby's and Arnold's cell phone records, which were obtained by search warrant. The review of Goolsby's cell phone records demonstrated that, on April 5, she called Ruley at 10:51 p.m., and after that phone call, no more outgoing text messages or phone calls were ever placed from her phone. Arnold's cell phone records demonstrated that he texted his mother at 4:22 a.m. on April 6, stating "mom, she kicked me out. Been all night trying to find somewhere to go." Arnold did not make any phone calls to Ruley on April 5 as he alleged. Corporal Dixon

18

testified that, at this point in the investigation, "[a]ll the evidence led [them] to Alfred Arnold being [their] prime suspect."[22] Following a second interview of Arnold on April 18, Arnold was arrested for Goolsby's murder.

Arnold was fingerprinted at the RCSO following his arrest. GBI latent fingerprint examiner Nicole Lorenzo, who was admitted as an expert in fingerprint examination at trial, testified that she located a fingerprint card in a national fingerprint database (the "fingerprint database") containing a fingerprint "identified to the left middle finger of the fingerprint card bearing the name Alfred Jermaine S. Arnold." Lorenzo then compared Arnold's fingerprint card from the RCSO to the "card from the [fingerprint] database" and "confirm[ed] that they were from the same source." Lorenzo also compared the lift fingerprints taken "from [the] jar of blue Majik hair gel" found at the crime scene to the same fingerprint card from

---

[22] Investigator Jones testified that, once they identified Arnold as a potential suspect, she recognized that the collection of any of Arnold's DNA on the surfaces of Goolsby's house would not be helpful because he "actually resided there," so "if anything was located with his DNA, it wouldn't have told [them] anything."

the fingerprint database and "confirm[ed] that they were from the same source." Lorenzo then "determine[d] that these two prints came from the same source" — i.e., the "latent print" on the hair gel jar and the "known print" on Arnold's fingerprint card from the RCSO. Lorenzo thus concluded, "based upon [her] experience and training to a reasonable degree of scientific certainty," that Arnold, "whose known prints" were contained on the fingerprint card from the RCSO, "made the latent prints" on the jar of hair gel.

1. Relying on *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979), Arnold first contends that the evidence in this case was insufficient as a matter of constitutional due process to convict him of the crimes charged. Arnold also argues that, as a matter of Georgia statutory law, "[n]o rational jury could have convicted [him] on the circumstantial evidence presented" under OCGA § 24-14-6 because "there [was] no direct evidence that [ ] Arnold bludgeoned the victim" and because the "facts do not exclude Robert Ruley as the perpetrator of the crime." These claims fail.

20

> We review the constitutional sufficiency of the evidence by reviewing the evidence at trial in the light most favorable to the verdicts to determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt, without weighing the evidence or resolving conflicts in testimony. . . . We defer to the jury's resolution of any conflicts in the evidence, the credibility of witnesses, and the drawing of reasonable inferences from the facts.

*Hooks v. State*, 318 Ga. 850, 852 (2) (a) (901 SE2d 166) (2024). See also *Ridley v. State*, 315 Ga. 452, 455 (2) (883 SE2d 357) (2023) ("In making this determination, we do not evaluate witness credibility, resolve inconsistencies in the evidence, or assess the weight of the evidence; these tasks are left to the sole discretion of the jury," and the "jury's verdicts will be upheld as long as some competent evidence, even if contradicted, supports each fact necessary to make out the State's case.").

While the evidence in this case was circumstantial, "circumstantial evidence alone can be constitutionally sufficient," *Hooks*, 318 Ga. at 852 (2) (a), and the evidence here was sufficient as a matter of constitutional due process to authorize the jury to find Arnold guilty of Goolsby's murder and the other offenses with which

21

he was charged. See *Ridley*, 315 Ga. at 455 (2). That evidence established that, on the night of April 5, Goolsby called Ruley on her cell phone at 10:51 p.m., which was the last outgoing communication she ever made, and she was beaten to death at some point during the subsequent overnight hours. Arnold, who told law enforcement officers he was kicked out of and left Goolsby's house around 8:00 p.m. on April 5, texted his mother from his cell phone at 4:22 a.m. on April 6, saying he had been kicked out and had nowhere to go. At the time Arnold texted his mother, his cell-phone-location data demonstrated that his phone was located at Goolsby's house at 1415 Lester Road. Moreover, that cell-phone-location data demonstrated that Arnold's cell phone left and returned to Goolsby's house during the early morning hours of April 6, traveling to the Bryant Street area, where Arnold's mother later collected his belongings from an abandoned house and where Goolsby's vehicle was later discovered directly across the street from that abandoned house. When Arnold's cell phone traveled back to Goolsby's house between 3:27 a.m. and 4:02 a.m. on April 6, it remained there until approximately 9:00

a.m., the same time a vehicle matching Goolsby's left her residence at 1415 Lester Road and never returned. Arnold's cell phone then traveled to the Bryant Street area again and, after a few minutes, was in the possession of someone walking to 1091 Arnold Circle — where it essentially remained until the late morning hours of April 7, and where Ruley, Richetta, and Arnold said he stayed from the morning of April 6 to the morning of April 7. In the bedroom Arnold rented from Goolsby, law enforcement officers found a T-shirt stained with Goolsby's blood, and in the duffel bag Arnold left at his mother's apartment, law enforcement officers located a black glove shoved inside one of Arnold's shoes, which was covered with a substance that shared chemical and optical similarities with the retardant-like material found on Goolsby's body and in her bedroom. In addition, Arnold's fingerprint was found on a jar of hair gel that was discovered on the mattress in Goolsby's bedroom, which had apparently been left in the bedroom after the bedroom was sprayed with fire retardant, as none of the retardant was inside or on the exterior of the jar when it was recovered by law enforcement officers.

23

Arnold also gave inconsistent statements to law enforcement officers about his whereabouts and activities on the night of April 5 and morning of April 6, the timeframe during which Goolsby was killed. Viewed in the light most favorable to the verdicts, this evidence was sufficient for the jury to find Arnold guilty of malice murder, arson, and theft by taking. See *Jackson*, 443 U. S. at 319 (III) (B).

With respect to Arnold's statutory claim that "[n]o rational jury could have convicted [him] on the circumstantial evidence presented" because "there [was] no direct evidence that [ ] Arnold bludgeoned the victim" and because "the [ ] facts do not exclude Robert Ruley as the perpetrator" of Goolsby's murder, we note that, under Georgia statutory law, when a "conviction is based on circumstantial evidence, the State must present sufficient evidence to 'exclude every other reasonable hypothesis save that of the guilt of the accused.'" *Hooks*, 318 Ga. at 853 (2) (b) (quoting OCGA § 24-14-6). See also OCGA § 24-14-6 ("To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable

24

hypothesis save that of the guilt of the accused."). Additionally, "[n]ot every hypothesis is reasonable, and the evidence does not have to exclude every conceivable inference or hypothesis; it need rule out only those that are reasonable." *Drennon v. State*, 314 Ga. 854, 861-862 (3) (880 SE2d 139) (2022) (citation and punctuation omitted). "Whether alternative hypotheses are reasonable is usually a question for the jury, and this Court will not disturb the jury's finding unless it is insufficient as a matter of law." Id. (citation and punctuation omitted).

Although Arnold argues that the evidence presented at trial did not exclude the possibility that Ruley was the person who killed Goolsby, Arnold points to no evidence supporting such a theory. Instead, the evidence presented at trial, while circumstantial, was sufficient to support the reasonable hypothesis that Arnold — whose cell-phone-location data placed him at Goolsby's house between the night of April 5 and morning of April 6 — beat Goolsby to death that night; started a fire in her bedroom in an apparent attempt to conceal the crime; later extinguished the fire using a fire

extinguisher from the kitchen; stashed a glove covered in fire retardant into one of his shoes; put his shoes and clothing into a duffle bag; locked up Goolsby's house; stole Goolsby's car;[23] drove to a location walking distance from 1091 Adcock Circle where he dropped off his belongings on the porch of an abandoned house and left Goolsby's car in the woods across the street; walked to 1091 Adcock Circle; got a ride from his mother to the abandoned house and gave her his belongings to take back to her home in Morrow; returned to 1091 Adcock Circle for the remainder of the day and night on April 6; got a ride from Ruley on April 7 to meet his mother between Conyers and Morrow; never returned to Conyers; and lied to law enforcement about his whereabouts and activities during the night of April 5 and morning of April 6.

Given this evidence, we see no reason to disturb the jury's conclusion that Arnold, rather than Ruley, was the perpetrator of Goolsby's murder. See *Drennon*, 314 Ga. at 863 (3).

---

[23] Several witnesses, including Lester, Ruley, and Richetta, testified that Arnold did not have a car, whereas Ruley owned two vehicles.

2. Arnold next contends that either his discovery rights were violated, or he received ineffective assistance of trial counsel "regarding the admission of the fingerprint match between [Arnold] and the hair gel jar since [Arnold] was not properly informed of the expert witness nor the report of that witness prior to trial." We will address each contention in turn.

(a) *Discovery violation claim.*

Arnold asserts that the trial court abused its discretion in admitting the testimony of GBI latent fingerprint examiner Lorenzo at trial because Lorenzo was only listed on the State's initial witness list and because Arnold "did not receive a fingerprint report" from Lorenzo that "expressly stated that his fingerprints matched the

fingerprints found on the hair gel jar" in violation of OCGA § 17-16-4 (c)[24] and *Brady*.[25] This claim fails.

At trial, before the State presented Lorenzo's testimony, Arnold's trial counsel advised the trial court that Arnold was "never given any report saying there was a comparison by Ms. Lorenzo" of "the known print card" of Arnold from the RCSO and the "recovered prints" from the hair gel jar, and trial counsel argued that Lorenzo "can't just come in on the stand and do a comparison and have that be admissible," contending that doing so would be a *Brady* violation.

The prosecutor responded that Lorenzo was "not going to testify that she looked at the latent prints that were taken from the [hair gel] jar and then compared [them] to the known prints that [ ] Arnold provided" to the RCSO following his arrest. The prosecutor

---

[24] OCGA § 17-16-4 (c) provides that,
[i]f prior to or during trial a party discovers additional evidence or material previously requested or ordered which is subject to discovery or inspection under this article, such party shall promptly notify the other party of the existence of the additional evidence or material and make this additional evidence or material available as provided in this article.

[25] See *Brady v. Maryland*, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963).

28

explained that Lorenzo would testify that she compared "the latent prints to the [fingerprint] database hit[,] . . . which matched"; she "compared the database hit to the known samples of [ ] Arnold, which also matched"; and she thus "determine[d] that these two prints came from the same source." The prosecutor noted that "[t]his [was] a method that the GBI [was] utilizing" now and advised the trial court that Arnold was "provided both of [Lorenzo's] official reports," which were generated on July 10, 2020, and July 8, 2022.

Arnold's trial counsel countered that, although Arnold received those expert reports "saying that the latent prints gave the [fingerprint database] hit, and that they compared the [fingerprint database] hit to [Arnold's] fingerprints when he was booked in the jail," Arnold was "not put on notice that [Arnold's] known prints from the jail . . . matched the latent" prints. The trial court asked Arnold's trial counsel whether Arnold was nonetheless on notice of the expert's conclusions given that Arnold knew the latent prints taken from the hair gel jar at the crime scene matched his

fingerprint database prints, and he also knew his known RCSO prints "matched the [fingerprint database] prints." Trial counsel again argued that Arnold was not on notice because no report confirming that the latent prints and known prints matched was "shared" with them.

The trial court ruled that "there [was] not a *Brady* violation; that the defense was on notice," and the trial court would "allow for the admission of this testimony." Arnold's trial counsel did not ask for a continuance to obtain an expert to testify on Arnold's behalf, and when Lorenzo testified, Arnold's trial counsel did not object to her testimony or seek to voir dire her further on these issues.

Because Arnold did not raise or renew his objection to Lorenzo's testifying at trial, object to the admission of Lorenzo as an expert in fingerprint examination, or make any other objections during her trial testimony, see OCGA § 24-1-103 (d), we are limited to a plain-error review of this claim. See *Wipfel v. State*, 320 Ga. 84, 87 (2) (907 SE2d 639) (2024).

For an appellant to establish plain error, first, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

Id. (citation and punctuation omitted). "An appellant must establish all four elements of the test in order to demonstrate plain error, so satisfying this test is difficult, as it should be." *Clark v. State*, 315 Ga. 423, 440 (4) (883 SE2d 317) (2023) (citation and punctuation omitted). Because Arnold has not met his burden of proving that "the trial court clearly and obviously erred" in allowing the fingerprint evidence to be admitted at trial, Arnold's claim fails on plain-error review. Id. See also *Wipfel*, 320 Ga. at 87 (2).

The record in this case does not demonstrate any discovery violations by the State or any lack of notice to Arnold regarding this

31

expert's testimony and her reports as he alleges on appeal. Instead, the record reflects that the State's fingerprint examiner was included on the witness list provided to Arnold before trial, and the State also timely provided the defense with written reports reflecting this expert's opinions, as Arnold's trial counsel conceded at trial. See *Murphy v. State*, 299 Ga. 238, 244 (3) (787 SE2d 721) (2016) (concluding that the appellant did not meet her burden of showing plain error where the expert "was included on the State's witness list" and "his written report" was "provided to defense counsel prior to trial"). In sum, Arnold has not proven any error, let alone plain error, and as such, he has failed to meet "his high burden of proving plain error" in this case. *Clark*, 315 Ga. at 442 (4).

(b) *Ineffective assistance of counsel claim.*

Arnold also contends that, even "if there were no discovery violations" by the State, his "trial counsel was ineffective regarding the [State's fingerprint expert] and [the expert's] conclusions in violation of the Sixth Amendment of the United States Constitution and Article I, Section I, Paragraph XIV of the Georgia Constitution."

In support of this contention, Arnold alleges that his trial counsel was "constitutionally ineffective" in "failing to perceive that there was a fingerprint match between the hair gel jar and [ ] Arnold and to so advise him." See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984).

For a defendant "[t]o prevail on a claim of ineffective assistance of counsel," the defendant "generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant." *Moss v. State*, 311 Ga. 123, 126 (2) (856 SE2d 280) (2021) (citing *Strickland*, 466 U. S. at 687-695 (III)). We have said that, "[t]o satisfy the deficiency prong, a defendant must demonstrate that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." Id.

> The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case, and decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

33

*Taylor v. State*, 312 Ga. 1, 15-16 (6) (860 SE2d 470) (2021) (citation and punctuation omitted).

Additionally, "[t]o satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." *Moss*, 311 Ga. at 126 (2). "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." Id. (citation and punctuation omitted). Here, Arnold failed to meet his burden of proving either deficiency or prejudice.

(i) *Deficiency*.

Arnold contends that his trial counsel performed deficiently in the following ways: (1) "failing to interview the crime lab fingerprint technician or even to understand, prior to trial, that [ ] Arnold's fingerprints matched to the latent prints on the hair gel jar"; (2) failing "to request a continuance to interview the technician or to subpoena the technician's documents and notes that supported her

34

conclusions"; and (3) failing "to request the reinstatement of the plea offer so that [ ] Arnold could consider that offer in light of the fingerprint results." Arnold has not shown that his trial counsel failed to employ a reasonable strategy in countering the State's fingerprint expert at trial. See *Rosenbaum v. State*, 320 Ga. 5, 12 (1) (907 SE2d 593) (2024).

Arnold was represented at trial by two criminal defense attorneys with extensive trial experience and forensics training, who had been practicing law a combined total of 38 years. At the motion-for-new-trial hearing, Arnold's trial counsel testified that, when this case went to trial, they were not yet aware that the "GBI policies and procedure had [recently] changed as to the way they report fingerprints," so they did not have a full understanding of how the State's fingerprint examiner would testify at trial. Trial counsel also testified that, because they were in "the midst of trial" when they learned Lorenzo would testify this way, they did not have time to retain an independent expert to analyze the fingerprints on Arnold's behalf. Nevertheless, prior to Lorenzo's testimony, Arnold's

trial counsel moved to exclude the admission of the fingerprint database report Lorenzo had utilized, and after that motion was denied, trial counsel thoroughly cross-examined Lorenzo at trial, including obtaining an admission from Lorenzo that she could not testify as to when the fingerprints were made on the jar of hair gel. During closing argument, Arnold's trial counsel also argued about the lack of evidence in this case and the fact that, because Arnold lived in Goolsby's house with her, the fingerprint on the hair gel jar was essentially meaningless and could have been left at any time.

"[O]ur inquiry is focused on the objective reasonableness of counsel's performance," *State v. Tedder*, 305 Ga. 577, 584 (826 SE2d 30) (2019) (citation and punctuation omitted), and Arnold has not shown that, despite his trial counsel's alleged failure to properly anticipate or prepare for how the State's fingerprint expert would testify at trial, "no competent attorney" would have proceeded the way his trial counsel did here — i.e., moving to exclude the fingerprint database report as hearsay, engaging in a thorough cross-examination of the expert witness, arguing about the lack of

36

evidence linking Arnold to the crimes, and discounting the significance of the fingerprint evidence, given that the defendant and victim lived together. Id. at 583. In short, Arnold bears the burden of showing that his trial counsel's actions here were "patently unreasonable," and he has not done so. *Lockhart v. State*, 298 Ga. 384, 386 (2) (782 SE2d 245) (2016).

(ii) *Prejudice.*

Nevertheless, even if we had concluded that trial counsel performed deficiently in the handling of the fingerprint evidence in this case, Arnold "has not shown that a reasonable probability exists that the result of the trial would have been different had trial counsel attempted to retain an expert" to conduct an independent analysis of the fingerprint evidence or been better prepared for how the State's fingerprint expert would testify at trial. *Waters v. State*, 317 Ga. 822, 831-832 (3) (b) (ii) (896 SE2d 507) (2023).

On appeal, Arnold contends that he was prejudiced by his trial counsel's performance because "the plea offer was withdrawn [by the State] prior to [ ] Arnold being informed of the fingerprint expert

37

witness and that expert's conclusions." However, Arnold did not testify at the motion-for-new-trial hearing, so the record is devoid of any evidence demonstrating that, but for trial counsel's alleged failures to understand and properly advise Arnold about the fingerprint evidence, he would have accepted the State's plea offer instead of proceeding to trial. See *Cleveland v. State*, 285 Ga. 142, 147 (674 SE2d 289) (2009) (concluding that the defendant failed to demonstrate that, but for his trial counsel's deficient performance, "there is a reasonable probability that [he] would have accepted the State's pretrial plea offer"). Mere "speculation is insufficient to establish prejudice in a claim of ineffective assistance of counsel." *Alexander v. State*, 313 Ga. 521, 533 (5) (870 SE2d 729) (2022).

Additionally, at the motion-for-new-trial hearing, Arnold did not call an expert witness to testify as to what evidence could have been elicited from a potential expert at trial with respect to the fingerprint evidence, and thus, he "has not shown that a reasonable probability exists that the result of the trial would have been different" had such an expert testified on his behalf. *Waters*, 317 Ga.

38

at 831-832 (3) (b) (ii). "It is well established that a defendant fails to establish prejudice under *Strickland* when he merely contends that trial counsel was deficient for failing to present an expert, without also presenting evidence at the motion-for-new-trial hearing about what the potential expert would have testified to at trial." *Pauldo v. State*, 317 Ga. 433, 437 (1) (a) (893 SE2d 633) (2023).

Based on the foregoing, we conclude that Arnold failed to meet his burden of showing that his trial counsel was constitutionally deficient under *Strickland* with respect to their strategy in handling the State's fingerprint expert or that he was prejudiced by an alleged inability to assess whether to take the State's plea offer, such that "a reasonable probability exists that the result of the trial would have been different" had this evidence not been presented at trial. *Pauldo*, 317 Ga. at 437-438 (1) (a). Therefore, this ineffective assistance of counsel claim fails.

3. Arnold's final contention is that the trial court improperly admitted testimony from Casey Jarvis, the State's material analyst,

39

"in violation of the *Daubert* standard" and OCGA § 24-7-702 (b).[26]

Arnold argues that Jarvis's testimony was "unreliable" in this case because she was "not qualified" and because she did not conduct all necessary tests, demonstrating that she "clearly did not reliably apply scientific principals [sic] and methods to the facts of this case."

OCGA § 24-7-702 was amended in 2022 "to apply in all proceedings rather than only in all civil proceedings." *Brookins v. State*, 315 Ga. 86, 104 (9) (879 SE2d 466) (2022) (citation and punctuation omitted). "With that amendment, which became effective on July 1, 2022, the General Assembly extended 'to criminal cases the federal standard of admissibility of expert

_____

[26] OCGA § 24-7-702 (b) provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if:

(1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(2) The testimony is based upon sufficient facts or data;

(3) The testimony is the product of reliable principles and methods; and

(4) The expert has reliably applied the principles and methods to the facts of the case.

40

testimony articulated in *Daubert . . .* and its progeny.'" *Garrison v. State*, 319 Ga. 711, 725 (3) (b) (905 SE2d 629) (2024) (quoting *Smith v. State*, 315 Ga. 287, 300 (2) (b) n.6 (882 SE2d 300) (2022)). See also Ga. L. 2022, p. 201, §§ 1 (amending OCGA § 24-7-702) and 3 (noting the date the amendment became effective).

> In determining the admissibility of expert testimony under the *Daubert* standard, the trial court acts as a gatekeeper, assessing both the witness' qualifications to testify in a particular area of expertise and the relevancy and reliability of the proffered testimony. And the trial court examines reliability through a consideration of many factors, including whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training.

*Garrison*, 319 Ga. at 726 (3) (c) (i) (citation and punctuation omitted). "The determination of whether a witness is qualified to render an opinion as an expert is a legal determination for the trial court and will not be disturbed absent a manifest abuse of discretion." *HNTB Ga. v. Hamilton-King*, 287 Ga. 641, 642 (1) (697 SE2d 770) (2010) (citation and punctuation omitted).

41

Applying those principles here, we conclude that the trial court did not abuse its discretion in determining that Jarvis's opinion satisfied the requirements of *Daubert* and OCGA § 24-7-702 (b) in this case. See *HNTB Ga.*, 287 Ga. at 642 (1). See also *Garrison*, 319 Ga. at 726 (3) (c) (i) (citing *Daubert*, 509 U. S. at 592-593 (II) (C)).

After Arnold filed a motion in limine seeking to exclude Jarvis's expert opinion testimony at trial, the trial court held a pretrial hearing, during which Jarvis and Arnold's expert, Dr. Edward Brown, testified extensively regarding the testing methods utilized for testing and examining Arnold's glove, the powder sample taken from Goolsby's bedroom, and the car jack collected in this case. At the conclusion of that pretrial hearing, the trial court ruled as follows:

> I find that Ms. Jarvis is an expert in materials analysis. She has the special skilled training. She has experience and knowledge and regularly tests samples for their chemical composition. She holds several professional memberships. She has received honors and awards in school. She obtained a degree from the University of West Georgia. And more impressively, has a Masters in Forensic Science from the University of Pennsylvania. . . . She presented at workshops in 2022 and 2021, during

Covid, of course, it was virtual, regarding foreign and particulate examination, and isolation and analysis. One of those was in Fort Collins . . . in Colorado. And then in Bethesda, Maryland also. She graduated magna cum laude from the University of Georgia at West Georgia and had an undergraduate award in analytical chemistry. I find that her opinion testimony is based upon sufficient facts and data as is evidenced by her existing expertise. And of course, we have seen her presentation of the facts and data, and I find that it is sufficient. I find that her opinion testimony is a product of reliable principles and methods. . . . [E]ven the Defense expert had to admit that most, if not all, of those methods were the correct scientific method or suitable for scientific methods. I think he opined there was some other method he might have used. And I think that her testimony, finally, is relevant to the — this case. And is therefore also admissible.

The trial court then issued a written ruling, detailing Jarvis's education, employment experience, professional qualifications, and testing methods. The trial court determined that the "main function" of Jarvis's employer "was unknown material characterization, i.e., to determine what a material actually is and where it originated from" and that "Ms. Jarvis described in detail the various testing procedures that were used and the types of equipment used to

43

conduct such tests." The trial court also found that, although

Arnold's own expert witness in chemistry, "questioned the

persuasiveness of Ms. Jarvis'[s] testing, he admitted that the

methods and tests she used were accepted in the scientific

community as valid and reliable testing methods." Then, applying

*Daubert* and OCGA § 24-7-702 (b), the trial court concluded that,

> [b]ased on the evidence presented, the Court finds that (1) Ms. Jarvis[ ] has specialized knowledge, skill, experience, training, and education regarding material analysis; (2) Ms. Jarvis'[s] scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[;] (3) Ms. Jarvis's testimony regarding material analysis is based upon sufficient facts or dat[a;] (4) Ms. Jarvis'[s] testimony on material analysis is the product of reliable principles and methods[;] and (5) Ms. Jarvis[ ] has reliably applied the principles and methods to the facts of this case.[27]

The trial court's written order reflects that it applied the

applicable standard in this case, "assessing both the witness'[s]

qualifications to testify in a particular area of expertise and the

---

[27] After Jarvis testified at trial, Arnold called his own expert witness, Dr. Brown, who testified at length about the mechanisms and techniques utilized to test the substances at issue, as well as his own conclusions regarding the material analysis.

relevancy and reliability of the proffered testimony." *Garrison*, 319 Ga. at 726 (3) (c) (i) (citation and punctuation omitted). See also OCGA § 24-7-702 (b). We thus conclude that the trial court did not abuse its discretion in admitting Jarvis's testimony at trial under *Daubert* and OCGA § 24-7-702 (b). See *Garrison*, 319 Ga. at 725 (3) (b) n.25. Accordingly, Arnold's final contention also fails.

*Judgment affirmed. Peterson, CJ, Warren, PJ, and Bethel, Ellington, McMillian, Colvin, and Pinson, JJ, concur.*

Decided May 6, 2025.

Murder. Rockdale Superior Court. Before Judge Mumford.

*Albert A. Myers III*, for appellant.

*Alisha A. Johnson, District Attorney, Alicia C. Gant, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General, Virginia D. Frazier, Assistant Attorney General*, for appellee.