NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: December 9, 2025

S25A1239.  MOSS v. THE STATE.

WARREN, Presiding Justice.

Appellant Lorenzo Moss was convicted of malice murder and other crimes in connection with the shooting death of his grandfather, Andrew Donaldson.[1]  In this appeal, Moss contends that the evidence presented at his trial was constitutionally insufficient and that the trial court abused its discretion by admitting into evidence certain text messages.  Seeing no error, we

---

[1] The crimes occurred on February 13 or 14, 2022.  In March 2022, a Hall County grand jury indicted Moss for malice murder, felony murder, aggravated assault, two counts of first-degree arson, and attempted concealment of the death of another.  At a trial from April 29 to May 3, 2024, the jury found him guilty of all counts.  The trial court sentenced Moss to serve life in prison for malice murder, 20 consecutive years for one of the counts of first-degree arson, and 5 consecutive years for attempted concealment of the death of another.  The remaining counts were vacated or merged.  Moss filed a timely motion for new trial, which he later amended through new counsel.  After a hearing, the trial court denied the motion in March 2025.  Moss then filed a timely notice of appeal; the case was docketed to this Court's August 2025 term and submitted for a decision on the briefs.

affirm.

1. Moss contends that the evidence presented at his trial was not sufficient as a matter of constitutional due process to support his convictions for malice murder, first-degree arson, and attempted concealment of the death of another.[2]   In evaluating the constitutional sufficiency of the evidence, we view all of the evidence presented at trial in the light most favorable to the verdicts and consider whether any rational juror could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted.  See *Jackson v. Virginia*, 443 US 307, 319 (1979).  "We defer to the jury's resolution of any conflicts in the evidence, the credibility of witnesses, and the drawing of reasonable inferences from the facts." *Arnold v. State*, 321 Ga. 434, 442 (2025) (quotation marks omitted).

(a) Viewed in this light, the evidence presented at Moss's trial

---

[2] Moss also appears to contend that the evidence was not sufficient to support the felony-murder count, aggravated-assault count, and remaining first-degree-arson count.  But Moss was not sentenced for those crimes, so any such claim is moot.  See, e.g., *Scoggins v. State*, 317 Ga. 832, 833 n.3 (2023).

2

showed the following. At 6:22 a.m. on February 14, 2022, one of Donaldson's neighbors called 911 and reported that Donaldson's house was on fire. Emergency responders encountered heavy flames engulfing the roof of the house, and after they forced entry through the locked doors, they found a partially burned dead body, later identified as Donaldson, on the living room floor. Once the fire was extinguished, the lead fire investigator determined that there had been three separate fires—one in the living room near where Donaldson's body was found, another in a bedroom, and a third in the garage. Investigators found a gas can that contained gasoline in the living room, and testing later showed that gasoline was present on the clothing Donaldson was wearing and on debris collected from the living room and bedroom. Investigators also found a spent .40-caliber bullet and a .40-caliber shell casing in the living room, as well as a disassembled .40-caliber gun in the garage.

The medical examiner who performed Donaldson's autopsy concluded that he had been shot once; the bullet traveled through his wrist and head, consistent with his having raised his arm in a

3

defensive posture.  Explaining that there was no soot in Donaldson's airway, which indicated that Donaldson was dead at the time of the fire, the examiner determined that Donaldson's death was caused by the gunshot wound to his head.  A firearms examiner reassembled the .40-caliber gun found in the garage and concluded that it had fired the bullet and shell casing found in the living room.

Donaldson's son Anthony Moss ("Anthony"), who sometimes stayed at Donaldson's house but was not there around the time of the fire, was informed of Donaldson's death shortly after Donaldson's body was found. Anthony responded to the scene and told investigators, and later testified at trial, that on the evening of February 11, his son Moss (Donaldson's grandson), who lived in Milwaukee, Wisconsin, and infrequently communicated with Anthony, unexpectedly arrived at Donaldson's house in a Toyota Highlander as Anthony and Donaldson were preparing to go to a grocery store.  Anthony and Donaldson were surprised that Moss was there, particularly because neither of them had provided him with Donaldson's address.  According to Anthony, "it just didn't

4

seem right." Moss asked to stay with Donaldson, but Donaldson said, "No," and told Moss to go to a hotel. The next day, February 12, a cell phone associated with Moss sent Anthony's phone a text message saying that Moss "decided to head home." At 11:39 p.m. on February 13, the night before the fire, Donaldson's phone sent Anthony's phone a text message that said: "Ren is here! He just popped up."[3] At 12:29 a.m., Donaldson's phone sent Anthony's phone another text message that said: "I need you to come home!" Anthony did not see the texts until he awoke on the morning of February 14.[4] In addition, around 10:00 a.m. on February 14, while Anthony was still with investigators at the scene, Moss called Anthony, said that he was at a restaurant in Marietta, and asked for money so that he could travel back to Milwaukee.

Investigators determined that the Highlander that Moss was

---

[3] Anthony testified at trial that "Ren" is Moss's nickname.

[4] Anthony testified that although Donaldson and Moss did not see each other often, Anthony thought their relationship was "okay." He also testified that Donaldson was generally "cautious" and that he "would not [have been] happy about somebody pulling up at his house late at night."

driving had been rented from a car company, and they obtained GPS records showing that in the early morning hours on February 11, the Highlander left Milwaukee and first arrived at Donaldson's house at 6:27 p.m.; the Highlander arrived again at Donaldson's house around 11:30 p.m. on February 13 and traveled away from the house at 6:20 a.m. on February 14. Investigators also obtained cell-site location information for the cell phone that was associated with Moss, which showed that the phone was near Donaldson's house at 11:29 p.m. on February 13 and traveled away from the house at 6:20 a.m. In addition, an investigator testified that surveillance video from a neighbor's house showed that at 11:18 p.m. on February 13, a vehicle pulled into Donaldson's driveway; at 11:35 p.m., the vehicle's lights flashed, consistent with someone locking the doors; at 6:18 a.m. on February 14, a person walked from Donaldson's house to the vehicle, got in, and drove away; at the same time, light, which was "growing brighter and almost pulsating," was reflecting off a nearby truck; and within the next few minutes, the light grew "a lot brighter" and the investigator heard "sounds of the fire" on the

video.[5]  The GPS records for the Highlander showed that it later traveled to a restaurant in Marietta and then back to Milwaukee, and Moss was eventually arrested there.  Investigators searched Moss's apartment and found a disposable glove in a jacket pocket; testing later showed that Moss's DNA and gasoline were on the glove.

Moss elected not to testify.  He did not dispute that he visited Donaldson on the night before the fire; his theory of defense was that he had no motive to commit the crimes and that he was merely present around the time that someone else who was angry at Donaldson or Anthony killed Donaldson and set the house on fire.

(b) Moss argues that the evidence presented at trial and recounted above was not sufficient as a matter of constitutional due process because it was circumstantial and showed only that he was present at Donaldson's house around the time that the crimes were committed.  But as we have explained, "circumstantial evidence

_____

[5] The surveillance video was admitted into evidence at trial, but it is not included in the record on appeal.

alone can be constitutionally sufficient," *Arnold*, 321 Ga. at 443 (quotation marks omitted), and the circumstantial evidence in this case met that standard.

To that end, the evidence authorized the jury to infer that after Moss unexpectedly arrived at Donaldson's house on the evening of February 11, 2022, and was informed that he could not stay there, he returned—uninvited—to Donaldson's house around 11:30 on the night of February 13 and did not leave until around 6:20 a.m. the next day. The testimony about the surveillance video from the neighbor's house indicated that moments after Moss left Donaldson's house, flames began to engulf the house, and at 6:22 a.m.—only two minutes after Moss left—a neighbor called 911 to report the fire. Emergency responders found Donaldson, who had died from a gunshot wound before the fire, in the house. Investigators later determined that there were fires in three separate locations in the house, including in the area where Donaldson's body was found, and there was gasoline on Donaldson's clothes and on debris from the fire. Moss fled to Milwaukee shortly

after the fire, and a disposable glove that contained his DNA and tested positive for gasoline was found in a jacket in his apartment there. This evidence, construed in the light most favorable to the verdicts, authorized the jury to find beyond a reasonable doubt that Moss shot and killed Donaldson and then set fire to his house in an attempt to conceal the murder, such that Moss "was more than merely present" during the crimes. *Reid v. State*, ___ Ga. ___ (2025), S25A0736, slip op. at 13 (Ga. Oct. 21, 2025) (quotation marks omitted) (holding that the evidence, which included, among other things, surveillance video showing that the appellant slowly drove past the murder victim's house shortly before the shooting, walked behind the victim's house around the time of the shooting, and then reemerged shortly after the shooting, established that the appellant was not merely present during the crimes and was thus constitutionally sufficient to support his convictions for malice murder and other crimes). See also *Arnold*, 321 Ga. at 443–44 (concluding that the circumstantial evidence presented at the appellant's trial, which included evidence that his cell phone was

9

near the victim's house around the time of the murder, was constitutionally sufficient to support his convictions for malice murder and other crimes).

Moss points to the State's failure to present certain types of evidence—such as evidence that Moss had a motive to kill Donaldson, evidence that Moss made inculpatory statements about the crimes, evidence showing precisely when Donaldson was shot, evidence tying Moss to the murder weapon, and evidence that Moss was burned in the fire—to support his claim that the evidence presented at trial was not sufficient. But we have explained that "[a]lthough the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." *Reid*, slip op. at 10 (quotation marks omitted). See also, e.g., *Pritchett v. State*, 314 Ga. 767, 779 (2022) (explaining that the State is not required to prove motive because it is not an essential element of a crime). In other words, "the fact that the State did not produce certain types of evidence does not mean that the evidence was insufficient." *Reid*, slip op. at 9 (quotation

10

marks omitted).

In sum, the evidence presented at Moss's trial, while circumstantial, was sufficient as a matter of constitutional due process to support his convictions for malice murder, first-degree arson, and attempted concealment of the death of another. Accordingly, this claim fails. See OCGA §§ 16-5-1(a) (defining malice murder); 16-7-60 (defining first-degree arson); 16-4-1 (defining criminal attempt); 16-10-31 (defining concealing a death). See also *Pierce v. State*, 319 Ga. 846, 850–51 (2024) (holding that the evidence was constitutionally sufficient to support the appellant's convictions for malice murder and first-degree arson where the evidence showed that after the victim was shot in the head, the appellant set fires in three locations in a house with the victim's dead body inside and then fled); *Bennett v. State*, 304 Ga. 795, 796–97 (2018) (concluding that the evidence presented at the appellant's trial, which included evidence that he spread fuel near the area where the victim's body was found and ignited it, was constitutionally sufficient to support his conviction for concealment

11

of a death).

2. Moss also argues that the trial court abused its discretion by admitting into evidence the text messages sent from Donaldson's phone to Anthony several hours before the fire. As discussed above, the first text, which was sent at 11:39 p.m. on the night before the fire, said: "Ren is here! He just popped up." The second text, sent at 12:29 a.m., said: "I need you to come home!" At a pretrial hearing, Moss objected to the admission of the text messages on the ground that they constituted impermissible hearsay. See OCGA §§ 24-8-801(c) (defining "[h]earsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"); 24-8-802 (providing that subject to certain exceptions, hearsay is generally not admissible). The trial court ruled that the texts were admissible under the present-sense-impression and excited-utterance exceptions to the hearsay rule. See OCGA § 24-8-803(1) & (2). As discussed below, the trial court correctly determined that the first text message fell within the present-sense-impression exception,

12

and the second text message was not hearsay.  Thus, the trial court did not abuse its discretion by admitting the texts.

(a) The first text message—"Ren is here!  He just popped up."—was a statement Donaldson made out of court that the State offered to prove the truth of what Donaldson intended to assert in the text: that Moss arrived, without warning, at Donaldson's house on the night before the fire.   So the text was hearsay, see OCGA § 24-8-801(c), and it could only be admitted into evidence if it fell within an exception to the hearsay rule, see OCGA § 24-8-802.  One such exception is the present-sense-impression exception, which excludes from the hearsay rule "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter."  OCGA § 24-8-803(1). "To be admitted under this exception, the statement must describe or explain an event or condition that is personally witnessed by the declarant and is essentially contemporaneous to the statement." *Varner v. State*, 306 Ga. 726, 731 (2019) (quotation marks omitted).

Donaldson's statement satisfied these criteria.  The evidence

13

presented at trial authorized the trial court to conclude that the statement described what Donaldson personally perceived: Moss's unexpected arrival at Donaldson's house. And because the record supports a finding that Donaldson sent the text just after Moss arrived at the house the second time, the trial court was authorized to conclude that the statement was made soon enough upon arrival to satisfy the present-sense-impression exception. Accordingly, the trial court did not abuse its discretion by determining that the first text message fell within the present-sense-impression exception to the hearsay rule. See *Downer v. State*, 314 Ga. 617, 630–31 (2022) (holding that the trial court did not abuse its discretion by concluding that a witness's hearsay testimony that the declarant told her he was on the phone with the defendant, as he was speaking with him, fell within the present-sense-impression exception); *Varner*, 306 Ga. at 731–32 (holding that the declarant's statements repeating to investigators the statements that the wounded victim mumbled, immediately as the victim mumbled them, qualified as

14

present sense impressions).[6]

(b) Although the trial court determined that the second text message also fell within the present-sense-impression exception (as well as the excited-utterance exception), we conclude that the text was not hearsay in the first place. Donaldson's statement, "I need you to come home!," was not offered to prove the truth of the matter asserted, i.e., that Donaldson in fact needed Anthony to come home.[7] The State instead introduced the statement to support the inference

---

[6] Moss contends that because Anthony was asleep when the text message was sent and, at trial, he "merely agreed" with what the prosecutor told him about what time his cell phone indicated that the text was received, Anthony's testimony was "not sufficient to lay the foundation for the [present-sense-impression] exception." But Moss does not separately enumerate that issue as error. See, e.g., *Long v. State*, 321 Ga. 360, 362 n.3 (2025). And in any event, the State presented sufficient evidence to authorize the jury to find that the text was sent at 11:39 p.m. on February 13, 2022. See *Nicholson v. State*, 307 Ga. 466, 475 (2019) ("Under OCGA § 24-9-901(a), authentication of evidence may be achieved through any of a variety of means affording evidence sufficient to support a finding that the matter in question is what its proponent claims." (quotation marks omitted)).

We also note that because the first text message was admissible under the present-sense-impression exception to the hearsay rule, we need not determine whether it was also admissible under the excited-utterance exception. See *Robbins v. State*, 300 Ga. 387, 389 (2016).

[7] On this point, Moss concedes in his brief in this Court that the second text message "may not even qualify as hearsay because the jury did not have to assess the truth of any assertion."

15

that Donaldson feared Moss and believed that something bad was about to happen. Indeed, the prosecutor argued in closing that the jury could "infer from that text message [that] something was about to pop off, something was about to happen" and that "[t]he insinuation … [was] things aren't looking good."

Because the second text message was not hearsay, the trial court did not abuse its discretion by admitting the text over Moss's objection, and this claim fails. See *Henderson v. State*, 317 Ga. 66, 82–85 (2023) (holding that the trial court did not abuse its discretion by admitting certain statements into evidence over the defendant's hearsay objection because, although the trial court concluded that the statements fell within a "statutory exception[]" to the hearsay rule, some of the statements actually were "not hearsay at all," such that "they did not need to qualify for a hearsay exception to be admissible"); *Mosley v. State*, 307 Ga. 711, 716 n.3 (2020) (holding that a co-indictee's out-of-court statement shortly after the victim's murder asking another person to care for the co-indictee's child "[i]f anything happened" to the co-indictee was not hearsay, because it

16

was not offered to prove that the co-indictee wanted the person to care for her child and instead established that the co-indictee believed she would be unavailable to raise her child because she had participated in the murder); *Blackmon v. State*, 306 Ga. 90, 94 (2019) (explaining that certain out-of-court statements by the murder victim, including her statement shortly before her death that she loved her niece and nephew, may not have been hearsay because they were not offered to prove the truth of the matter asserted "but rather only to show that [the victim] had made the statement," which "reveal[ed] her fear of [the a]ppellant"). See also *United States v. Cruz*, 805 F2d 1464, 1478 (11th Cir. 1986) (holding that a GBI agent's out-of-court statement telling someone to "bring her supplier to the next meeting" was not hearsay because it was not offered for its truth but instead to support an inference that the appellant (whom the person in fact brought to the next meeting with the agent) was the supplier); Fed. R. Evid. 801(a), Advisory Committee Note (explaining that out-of-court statements do not constitute hearsay if "offered as a basis for inferring something other

than the matter asserted" by the declarant).[8]

*Judgment affirmed. All the Justices concur.*

---

[8] OCGA § 24-8-801(c) "essentially tracks its counterpart in the Federal Rules of Evidence," so we "look to the decisions of the federal appellate courts, particularly the Eleventh Circuit, for guidance in applying this provision." *Blackmon*, 306 Ga. at 94 n.2. See also *State v. Almanza*, 304 Ga. 553, 555–56 (2018). In addition, we have explained that the Advisory Committee Notes to the Federal Rules of Evidence are "highly persuasive (unlike ordinary legislative history)." Id. at 559 n.6.