NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 16, 2023

S23A0102.  THE STATE v. BRITTON.

MCMILLIAN, Justice.

Manvel Britton was charged with murder and other offenses in connection with the fatal shooting of Eddy Leonardo.[1] The State appeals the trial court's grant of Britton's motion to suppress evidence from his cell phone records obtained pursuant to a search warrant (the "Warrant") during the police investigation into that death.[2] The trial court found that the affidavit for the Warrant (the "Affidavit") contained a material misrepresentation which tainted the entire document, and, with that misrepresentation excluded, the

---

[1] Britton is charged with murder, felony murder (4 counts), criminal attempt to commit armed robbery, aggravated assault with a deadly weapon, possession of a firearm during commission of a felony, and possession of a firearm by a convicted felon (2 counts). The case was orally argued on March 29, 2023.

[2] See OCGA § 5-7-1 (a) (4).

Affidavit failed to establish the requisite probable cause to issue the Warrant. The trial court further found a "discrepancy" in the Affidavit that it determined affected the validity of the Warrant. The State argues on appeal that in reaching these conclusions, the trial court did not properly apply the law and failed to give proper deference to the magistrate judge who issued the Warrant. We agree and reverse for the reasons set forth below.

The Affidavit recites the following. On February 1, 2020, officers from the Roswell Police Department responded to a report of a shooting at a supermarket. When the officers arrived on the scene, they discovered Leonardo lying on the pavement in the parking lot with a gunshot wound to his torso. The officers also located a plastic bag containing a large sum of U.S. currency. Leonardo was transported to the hospital where he was pronounced dead.

Witnesses at the scene told the police officers that they had earlier seen an "unknown black male" exit the passenger side of a black Dodge Charger and approach Leonardo. The man got into a

physical altercation with Leonardo, then pulled a gun out of his waistband, and fired one shot. Leonardo fell to the ground. The unknown man got back into the Charger on the passenger side, and the car sped northbound on Alpharetta Highway. Based on this information, the officers consulted a nearby stationary license plate reader ("LPR") to search for any vehicles matching the witnesses' description and determined that a matching car had passed the LPR's location a few minutes prior to the incident. A search of other LPRs in the area revealed that the same black Dodge Charger had been in the vicinity of a bank where Leonardo made a stop earlier in the day, and video footage from a fast food restaurant showed that, approximately 15 minutes before the shooting, a black Dodge Charger was there at the same time Leonardo purchased food from the restaurant.[3] The Charger followed Leonardo's truck out of the restaurant's parking lot and onto the roadway.

Video footage from a location across the street from the

---

[3] Police discovered a receipt for this purchase in Leonardo's truck, leading them to obtain the video footage.

supermarket showed Leonardo arriving there in his truck, followed by a black Dodge Charger, which pulled in behind the truck. An unknown person then exited the Charger and appeared to head toward the truck. That same camera recorded the Charger exiting the supermarket's parking lot "at a high rate of speed" and heading northbound on Alpharetta Highway.

The Roswell officers obtained the license plate number for the black Dodge Charger from the LPRs and used that information to identify the vehicle's owner as James Travious English, Britton's co-defendant. The police later obtained a search warrant to obtain "call detail records with historical cell tower and geographical location data" for English's cell phone number. The search warrant also authorized the phone company to release "real time geographic location pinging of the phone number." From this information, officers discovered that the movements of the phone mirrored the movements of the Dodge Charger on the day of the shooting. Police arrested English, and, after impounding the Charger, obtained a warrant to search the vehicle. Britton's fingerprints were discovered

4

inside the Charger, and English's phone records showed that his phone and Britton's phone "had been communicating around the time of Leonardo's murder."

On February 3, 2020, Roswell police applied for a search warrant to T-Mobile for Britton's phone records. The Affidavit stated that one of the fingerprints in the Dodge Charger belonged to Britton, who was found to have a criminal history including armed robbery, thefts, and carrying a weapon in the commission of a felony. The Affidavit also stated that from a review of English's "historical phone records, it was discovered that he was in extensive communication with Britton around the time of the reported crimes." A Fulton County magistrate judge issued the Warrant to T-Mobile for "[s]ubscriber information[,] call detail records," "historical GPS/cell tower location" records, and "real time GPS location (pinging)" information for Britton's cell phone.

Britton was arrested for Leonardo's murder on February 11, 2020, and, on November 9, 2021, he filed a motion to suppress his cell phone location records seized pursuant to the Warrant (the "cell

5

phone location records").

Following a hearing, the trial court issued an order granting the motion to suppress based on its findings that the Affidavit contained both a material misrepresentation and a discrepancy that undercut the Warrant's validity. Specifically, the trial court found that the Affidavit materially misrepresented that English was in "**<u>extensive</u>** communication with Britton around the time of the reported crimes" because cell phone records showed that on the day of Leonardo's shooting English's phone and Britton's phone exchanged only thirteen calls, six of those calls were missed calls, and the remaining seven only lasted a total of two minutes and forty-two seconds. (Emphasis in original.) The trial court further found that this "material falsehood" tainted the entire Affidavit, and that without this "material falsehood," the Affidavit lacked sufficient evidence to support probable cause because the existence of Britton's fingerprint in English's car that was seized two days after the shooting did not place him in the car at the time of the shooting and the only description of the alleged assailant was that he was an

6

"unknown black male," and "Britton was not identified as being on the scene or being the assailant or even being a black male."

The trial court also questioned the veracity of the affiant due to a discrepancy on the face of the Affidavit. The body of the Affidavit began with the sentence: "The undersigned **Charles Jackson** being duly sworn, deposes and says: I am a Georgia certified peace officer charged with the duty of enforcing the criminal laws . . . ." but then further in the Affidavit, it states: "I **Detective Irving** am a sworn police in State of Georgia [sic] and am POST certified . . . . I attest the facts and circumstances below are true and accurate to the best of my knowledge." (Emphases in original.) However, the Affidavit was then signed by "Charles Jackson." Although the State claimed that the change from Charles Jackson to Detective Irving was a scrivener's error, the trial court rejected that argument, pointing out that the State put on no evidence to support the claim. The trial court concluded that "[d]ue to each of these deficiencies, either one of which would independently support this Court's finding [that the affiant lacked veracity], it is clear that the State has not met its

7

burden" to support the Warrant and ordered that all evidence of Britton's cell phone location information be excluded at trial. This appeal followed.

1. At the outset, we recount the applicable standard of review for analyzing a magistrate's decision to issue a search warrant.

A search warrant will issue only based upon an oath or affirmation stating "facts sufficient to show probable cause that a crime is being committed or has been committed." OCGA § 17-5-21 (a). The magistrate's task in determining if probable cause exists to issue a search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Moon v. State*, 312 Ga. 31, 57 (4) (860 SE2d 519) (2021) (citation omitted). See also *Copeland v. State*, 314 Ga. 44, 49 (3) (875 SE2d 636) (2022) ("The probable cause test requires only a fair probability—less than a certainty but more than a mere suspicion of

8

possibility—which by no means is to be equated with proof by even so much as a preponderance of the evidence." (citation and punctuation omitted)). And in analyzing probable cause, "a magistrate may draw 'reasonable inferences from the material supplied to him by applicants for a warrant.'" *Taylor v. State*, 303 Ga. 57, 61 (2) (810 SE2d 113) (2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 240 (III) (103 SCt 2317, 76 LE2d 527) (1983) (punctuation omitted). Therefore, "[t]he test for probable cause is not a hypertechnical one to be employed by legal technicians, but is based on the factual and practical considerations of everyday life on which reasonable and prudent men act." Id. at 60-61 (2) (citation and punctuation omitted).

If a magistrate's decision to issue a search warrant is challenged, the trial court provides "a first level of review, guided by the Fourth Amendment's strong preference for searches conducted pursuant to a warrant, and the principle that substantial deference must be accorded a magistrate's decision to issue a search warrant based on a finding of probable cause." *Palmer v. State*, 310 Ga. 668,

672 (2) (853 SE2d 650) (2021) (citation omitted).

> A deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.

*State v. Palmer*, 285 Ga. 75, 77-78 (673 SE2d 237) (2009) (citation omitted). See also *Taylor*, 303 Ga. at 61 (2) ("even doubtful cases should be resolved in favor of upholding a warrant") (citation omitted)).

On appeal, we review the grant of a search warrant by considering the totality of the circumstances "to determine if the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant." *Moon*, 312 Ga. at 57 (4) (citation omitted). See also *Gates*, 462 U.S. at 236 (III) ("[T]he Fourth Amendment requires no more."). And in reviewing the trial court's grant of Britton's motion to suppress in this case, because the State elected at the hearing on the motion to suppress to stand on

the facts as averred on the face of the Affidavit and neither party produced any witnesses to supplement the Affidavit, we apply a de novo review to the trial court's application of the law to those facts, bearing in mind the substantial deference owed to the magistrate's decision to issue the search warrant based on a finding of probable cause. See *Moon,* 312 Ga. at 57-58 (4).

2. Turning to the trial court's first ground for granting the motion to suppress – its finding that the Affidavit's averment that English "was in extensive communication with Britton around the time of the reported crimes" was "a material and false representation" – we are guided by the United States Supreme Court's decision in *Franks v. Delaware,* 438 U.S. 154 (98 SCt 2674, 57 LE2d 667) (1978). *Franks* explains that

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

Id. at 155-56. See also *Palmer,* 310 Ga. at 673-74 (2) (b). *Franks*

11

further provides that if a preponderance of the evidence at the hearing supports a finding of intentional or knowing falsehood or reckless disregard for the truth, the trial court must then view the affidavit with its "false material set to one side," and if

> the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

438 U.S. at 155-56. Under *Franks*, therefore, the trial court excludes the alleged falsehood from its probable cause analysis only if the preponderance of the evidence establishes an intentional or knowing falsehood or a reckless disregard for the truth. See also *Palmer*, 310 Ga. at 674 (2) (b) (applying the preponderance of the evidence test set out in *Franks*).

Here, Britton moved to suppress his cell phone location records under *Franks*, asserting that the Affidavit's reference to "extensive communication" between English and Britton "was false and was known to be false and presented in reckless disregard for the truth." In support of his motion, Britton produced copies of English's cell

phone records, but he did not argue to the trial court at the motion hearing that the alleged misrepresentation was intentional, knowing, or reckless. No witnesses testified at the hearing, and no other evidence was presented addressing Britton's allegation that the representation was "known to be false" or "presented in reckless disregard for the truth." The trial court determined that the representation of "extensive communication" between English and Britton was "a material falsehood" that "taints the entire warrant" and showed that "the affiant in this case lacks veracity" but did not make a determination as to whether this "falsehood" was made knowingly, intentionally, or in reckless disregard for the truth.

Pretermitting whether the trial court erred in finding a *Franks* violation without considering whether the representation was made knowingly, intentionally, or in reckless disregard for the truth,[4] we

---

[4] As we conclude below, the phrase "extensive communication" does not equate to a quantifiable number of contacts and is a subjective description of the contacts such that under *Franks,* it is that much harder to show that the representation was made intentionally and knowing that it was false or in reckless disregard for the truth. However, we need not further parse this issue because we determine that the trial court erred in finding that a misrepresentation was made at all.

conclude, after applying our de novo review of the Affidavit and the evidence presented at the hearing, that the trial court erred in finding that the statement that English "was in extensive communication with Britton around the time of the reported crimes" was a misrepresentation or falsehood.

The only evidence presented at the hearing on this issue was the Affidavit and a copy of English's cell phone records. The trial court found that there was no "extensive communication" because there were "only" thirteen calls between English's and Britton's phones on the day of the shooting; six of those thirteen were missed calls; of the remaining seven calls, most lasted "only" three or four seconds; all the calls combined amounted to a total of "*only*" two minutes and forty-two seconds; and "only" one of the phone calls lasted more than one minute. (Emphasis in original.)

But the term "extensive communication" can encompass a range of contacts during an unspecified period of time. See Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary (defining "extensive" as "having wide or considerable extent" and

14

defining "extent" as "the range over which something extends") (website last accessed May 2, 2023). Although the truth or falsity of an objective statement concerning the date, time, number, and duration of the cell phone calls between English and Britton might have been discernible from the evidence presented, the truth or falsity of the Affidavit's statement that the communication was "extensive" is not discernible from the evidence here, because it reflects a subjective description of what English's cell phone records show.[5]

Also, nothing in the Affidavit expressly limited the use of the phrase "extensive communication" to the day Leonardo was shot. Rather, the Affidavit referred to "extensive communication *around the time of* the reported crimes." (Emphasis supplied.) The cell phone records show that English and Britton exchanged fourteen phone

---

[5] We acknowledge that under different circumstances, such as if the records had shown only a single brief call or text message between English and Britton, the truth or falsity of the statement may have been more easily discernible from the evidence at the hearing. But because the cell phone records in this case reflect a number of communications between the two, whether that communication was "extensive" was a matter of perception and thus a subjective determination.

calls in an approximately seven-hour period, from 5:00 p.m. until shortly before midnight, on the day before Leonardo's death, January 31, 2020. Thus, the cell phone records show a total of 27 attempted and completed phone calls in an approximately 31-hour period surrounding the shooting. Fifteen of the calls took place before the shooting occurred, and those calls had a total duration of over 44 minutes. Given the number of contacts between Britton and English on the day before and the day of Leonardo's shooting, we cannot say based on the evidence presented that the phrase "extensive communication" as used in the Affidavit was false.

Accordingly, the trial court erred in determining that the statement was a misrepresentation and a falsehood and further erred by setting aside the statement concerning extensive communications in conducting its probable cause analysis.[6]

---

[6] The trial court further erred in conducting its probable cause analysis to exclude not only the descriptive phrase "extensive communication," with which it disagreed, but also to exclude consideration of any communications between English and Britton where the Affidavit also referenced their communications without the modifier "extensive" and the cell phone records clearly show that they were communicating both before and after the shooting.

16

3. Our analysis on appeal does not end here because we must also determine whether probable cause exists to support the Warrant if the trial court had properly considered the averment about the communications between Britton and English. The Affidavit stated that eyewitnesses told police, and security footage showed, that Leonardo was shot by someone in a black Dodge Charger and that the shooter exited the passenger side of the car, which supported that two people were in the car at the time Leonardo was killed. After the black Dodge Charger was identified by its license plate number, additional LPR data and security footage showed that the Charger followed Leonardo's vehicle as he went to the bank and ordered food before proceeding to the supermarket where the shooting occurred. English was then identified as the car's owner, and his cell phone records were obtained pursuant to a search warrant. English's cell phone records showed that the movement of his phone mirrored the movements of the Dodge Charger on the day of the shooting and further showed multiple calls with Britton around the time of Leonardo's shooting.

17

After police seized the Dodge Charger pursuant to a warrant, Britton's fingerprints were found in the car.

Considering the totality of the circumstances as presented in the Affidavit and applying substantial deference to the magistrate's decision, as we must, we conclude that the magistrate had a substantial basis for determining that probable cause existed to issue the Warrant, and the trial court erred in granting the motion to suppress on this ground. See *Copeland*, 314 Ga. at 50 (3) (sufficient probable cause to authorize search warrant for cell phone records based in part on volume of calls between defendant and his girlfriend, who was an ex-girlfriend of the victim); *Moon*, 312 Ga. at 58 (4) (magistrate had substantial basis for finding probable cause based on affidavit citing, in part, video recordings of the rental car used in the shooting, phone records showing one of the phones purchased by individual using the rental car had been used in close proximity to the scene of the crime around the time of the shooting, and defendant's fingerprints were found on the hood of rental car).

4. The trial court also cited a second ground for granting the

18

motion to dismiss, relying on what it termed "a discrepancy" in the Affidavit.

Britton asserted in his motion to suppress that "the affiant's identity is unclear"[7] and argued on appeal that, as a result, the Affidavit is invalid on its face. At the hearing on the motion, Britton's attorney noted that the first page of the Affidavit begins with the sentence, "The undersigned Charles Jackson being duly sworn, deposes and says: I am a Georgia certified peace officer charged with the duty of enforcing the criminal laws. . ." and that "[t]he facts tending to establish probable cause that a crime has been . . . committed are as follows." But the Affidavit then states:

> I, Detective Irving, am a sworn police [sic] in State of Georgia and am POST certified. I am employed by the Roswell Police Department and currently assigned the criminal investigations division. Obtaining and executing arrest and search warrants are a routine part of my daily job. I have been employed in law enforcement for almost

---

[7] Britton's motion also asserted that the affiant "was not a Georgia-certified peace officer," but he does not press this assertion on appeal. And, in fact, Britton notes in his supplemental brief that in two other search warrant affidavits in the record, Charles Jackson stated, "I am a POST certified Detective in the State of Georgia. I have been a police Detective for over 6 years and currently work for the Roswell Police Department and I am assigned to investigate fraud."

10 years and a sworn police officer/ detective for 9 years. I attest the facts and circumstances below are true and accurate to the best of my knowledge. The information was obtained through an investigation and from information relayed to me through other law enforcement personnel.

(Emphasis in original.) Based on this language, Britton argued that Detective Irving actually was the affiant, and because he did not sign the Affidavit, it is invalid.

At the hearing on the motion to suppress, the State elected to defend the viability of the Affidavit but countered that the reference to Detective Irving on the second page of the Affidavit was a scrivener's error. However, neither Detective Jackson, nor Detective Irving testified at the motion hearing, and no other evidence was presented in this regard, which the trial court noted in rejecting the State's argument. The trial court ultimately concluded that the veracity of the affiant was in question because it was unclear whether Detective Jackson or Detective Irving was the affiant, and also granted the motion to suppress on this alternate basis.

We disagree with the trial court's conclusion that the inclusion

of Detective Irving's statement renders the Affidavit invalid on its face.[8] Pretermitting whether the inclusion of Detective Irving's name in the Affidavit was the result of a scrivener's error, the Affidavit makes clear that Detective Jackson was its maker and that he was averring to the information included in that document.

On the first page of the Affidavit, Detective Jackson states that, "being duly sworn," he "deposes and says." The word "depose" in this context means "[t]o testify; to bear witness," see Black's Law Dictionary (11th ed. 2019) (second definition of "depose"), and the recitation that Detective Jackson has been sworn indicates that he was providing the information in the Affidavit under oath. See id.

---

[8] However, we agree with the trial court that the State's assertion of a "scrivener's error" required the State to produce evidence of that fact to prevail on that theory. The State asserted at the hearing that it was standing on the Affidavit as presented. See *State v. Slaughter*, 252 Ga. 435, 437 (315 SE2d 865) (1984) ("On the other hand, a search conducted pursuant to a search warrant, regular and proper on its face, is presumed to be valid and the burden is on the person who moves to suppress the items found to show that the search warrant was invalid."). But the State cannot at the same time rely on the Affidavit alone as proof of the Warrant's validity and also contend that the Court should substitute "Detective Jackson" in place of "Detective Irving," which can be construed as an acknowledgement that the Affidavit is not correct on its face. This issue does not affect our analysis, however, because we conclude that the Affidavit is valid on its face.

(defining "sworn statement" as "[a] statement given under oath; an affidavit"). In addition, the signature page of the Affidavit expressly identifies the affiant as Charles Jackson under the language, "I swear or affirm that all of the information contained in this Affidavit and all other testimony given by me under oath is true to the best of my knowledge and belief." A signature appears on that line, and the magistrate judge's signature appears below the language identifying the affiant as "Charles Jackson." The magistrate's signature is under additional language indicating that the Affidavit was "[s]worn to and subscribed to" before her.

Britton argues, however, that the Affidavit has not, in fact, been signed by the affiant because the contested language appears to indicate that Detective Irving is attesting to certain facts, the signature is illegible, and there is no proof that Detective Irving signed the Affidavit. But this argument ignores the magistrate's attestation that Detective Jackson, not Detective Irving, was the affiant and that Detective Jackson signed the document in her presence, which negates any ambiguity in the affiant's signature

itself. Moreover, the Affidavit shows that Detective Jackson swore or affirmed that all of the information contained in the Affidavit, which includes Detective Irving's statement, was true to the best of his knowledge and belief. Accordingly, the trial court erred to the extent that it found that the Affidavit was invalid based on the failure to identify the affiant when the face of the Affidavit showed that the affiant was Detective Jackson. See *Post v. State*, 298 Ga. 241, 243 (1) (779 SE2d 624) (2015) (addressing motion to recuse in a criminal case and providing that to be legally sufficient, an affidavit "must contain the three elements essential to a complete affidavit: (a) a written oath embodying the facts as sworn by the affiant; (b) the signature of the affiant; and (c) the attestation by an officer authorized to administer the oath that the affidavit was actually sworn by the affiant before the officer" (citation and punctuation omitted)).

Moreover, it is well settled that an application for a search warrant may be supported by hearsay. See *Jones v. United States*, 362 U.S. 257, 271 (80 SCt 725, 4 LE2d 697) (1960) (fact that affidavit

23

submitted in support of search warrant relied on hearsay was not alone sufficient to render affidavit invalid), overruled on other grounds, *United States v. Salvucci*, 448 U.S. 83 (100 SCt 2547, 65 LE2d 619) (1980); *State v. Stephens*, 252 Ga. 181, 183 (311 SE2d 823) (1984) ("Probable cause does not demand the certainty we associate with formal trials." (citation and punctuation omitted)). Cf. *Strauss v. Stynchcombe*, 224 Ga. 859, 864-65 (165 SE2d 302) (1968) (finding it well settled that probable cause to arrest may be established by hearsay evidence). Therefore, a warrant would be valid, even if an attesting officer swears to things in the affidavit he heard from another officer and even if he repeats the other officer's statements verbatim. And such hearsay information properly may be provided by other police officers participating in the investigation. See *Caffo v. State*, 247 Ga. 751, 754-55 (2) (b) (279 SE2d 678) (1981) ("Local law enforcement officers participating in a common investigation are reliable informants. Information provided by police officers, arising out of an official investigation, may be used to establish probable cause for a search warrant." (citations and

punctuation omitted)). Accordingly, even though the contested language is phrased as Detective Irving's attestation that he, not Detective Jackson, took the investigative steps described, Detective Jackson's oath swearing to the veracity of that information, attests that such actions were, in fact, taken. And under the circumstances of this case, the magistrate could reasonably infer that Detective Irving took the steps described and relayed the resulting information to Detective Jackson.

This Court addressed a somewhat analogous situation in *Dudley v. State*, 228 Ga. 551 (186 SE2d 875) (1972). There, the police officer applying for a search warrant attached an affidavit made by him and also an affidavit of a federal agent stationed in Miami, Florida, who had been working jointly with Atlanta police on the investigation. The federal agent's affidavit had information on which Georgia police sought to rely in obtaining the warrant. The defendant argued that the affidavit of the police officer, the only one who appeared in person to obtain the search warrant, was based on the affidavit of another, and that probable cause was not shown in

the police officer's affidavit. We concluded that "[t]he hearsay information relied on by [the police officer] was mainly from fellow officers engaged in the same investigation, and under such circumstances the hearsay information was sufficient evidence of probable cause for the issuance of the warrant." Id. at 560 (7).

Here when Detective Jackson's Affidavit includes information obtained from another officer working on the investigation, the magistrate was entitled to consider such hearsay evidence. Therefore, we conclude that the magistrate properly could rely on the Affidavit in determining that probable cause existed to issue the Warrant.

Accordingly, the trial court erred in granting Britton's motion to suppress on this ground.

*Judgment reversed. All the Justices concur.*