**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: February 17, 2026

S25A1158. CHAPPLE v. THE STATE.

ELLINGTON, Justice.

Johnny Chapple appeals his convictions for felony murder and other crimes in connection with the shooting death of Latoria Waller.[1] At trial, the chief issue was whether Chapple shot and killed Waller or whether, as Chapple asserted in defense, Waller

---

[1] The crimes occurred on February 15, 2022, and on March 22, 2022, a Baldwin County grand jury indicted Chapple for malice murder, two counts of felony murder predicated on aggravated assault and possession of a firearm by a convicted felon, aggravated assault, and possession of a firearm by a convicted felon. After a jury trial that ended on April 6, 2023, the jury found Chapple not guilty of malice murder but guilty of the remaining counts. On April 6, 2023, the trial court sentenced Chapple to life in prison without the possibility of parole on the felony murder verdict predicated on aggravated assault and to ten consecutive years in prison for the firearm offense. The other felony murder count was vacated by operation of law and the aggravated assault count was merged for sentencing purposes. On April 26, 2023, Chapple filed a motion for new trial, which he amended with new appellate counsel on November 5, 2024. The trial court denied the motion for new trial, as amended, on March 26, 2025. Chapple filed a timely notice of appeal, and the case was docketed to this Court's August 2025 term and submitted for a decision on the briefs.

shot herself with a 9mm handgun and then placed the handgun in the bottom drawer of a dresser before she became incapacitated. On appeal, Chapple contends that the trial court erred in denying his motion in limine to exclude expert testimony, that the trial court erred in applying an incorrect standard when ruling on his motion in limine, that the trial court erred in overruling his continuing witness objection, and that his trial counsel provided constitutionally ineffective assistance. For the reasons that follow, we affirm.

1. The evidence at trial showed that in February 2022, Chapple and Waller were in a relationship and residing together in Milledgeville, Georgia. On February 15, 2022, around 2:46 a.m., an officer with the Milledgeville Police Department responded to their home regarding a call that shots had been fired. He found Waller lying motionless and unresponsive on the floor of a bedroom. Waller was taken to a local emergency room, where she died from a gunshot wound to the heart. The door to the bedroom, which had a large crack in it and a scuff mark on it, was off its hinges, and was laying

2

on the floor in front of a dresser. A witness who left the house that night at about 1:30 a.m. testified that, before she left, she had gone to Waller's bedroom, did not remember the door being off its hinges, and thought that she would have remembered if she had seen it in that condition.

Chapple's brother, Carlos Simmons, and his wife, Savallia Bell, were in a back bedroom of the house at the time of the shooting. Chapple came into their bedroom, woke them up, and said, "[c]all 9-1-1. She's been shot." Chapple never said that Waller had shot herself, and he did not come to their bedroom at any time before he told them that Waller had been shot. Chapple then ran out the front door of the house and down the road, but subsequently returned to the house. Shortly after the shooting, a law enforcement officer encountered Chapple in the street in front of his house, and Chapple told him that he had heard a gunshot but had not seen a gun. Later that same morning in an interview at the police station, Chapple told a different officer that Waller "jumped on him" and slapped him and that he told her that he was going to "[p]ack his s**t up and

3

leave." He also told the officer that he then went and talked with Bell and that, while he was walking back to his bedroom, he heard the sound of someone falling in the bedroom, but that he never heard a gunshot.

A few days after Waller's death, Chapple's wife, from whom he had been separated for some time, was invited by Chapple's and Waller's landlord to go to the house and collect whatever of Chapple's belongings that she wanted. Chapple's wife went to the house with her mother and nephew. The mother testified that she was searching for Chapple's W-2 form when she saw a red notebook in a nightstand in Chapple and Waller's bedroom, where Waller was shot. When she looked inside the notebook, the mother saw an undated letter, which she described as "sad." During the mother's direct examination, the prosecutor read the letter into evidence. It said, among other things, that Waller knew that she had "disappointed" her mother; that she was "sorry from [her] heart"; that her father did not show her love because he put other things "before [her]"; that she loved her uncle who had died in 2020 and

missed him, but that she was "on the way"; that she had "found a better place" and would see them "when [they] got there." One of Waller's co-workers, Amanda Tipton, as well as Chapple's brother, Simmons, and his sister, Jamie Chapple, testified that they recognized the handwriting in the letter as that of Waller, while Bell testified that it was not Waller's handwriting. GBI Agent Amelia Maddox testified that she and another agent spent three and a half hours searching Chapple and Waller's bedroom for evidence on the day of the shooting and they did not find a notebook or any written documents when they searched the nightstand

Jamie Chapple testified about Waller's mental condition, saying that, in November 2021, she had a conversation with Waller in which Waller told her that she "felt like she was in this by herself" and that "no one really cared when she really needed them" and that, on another occasion, Waller told her that she felt "ready to go sometimes." On the other hand, Tipton testified that on February 14, when she and Waller drove to and from work together, Waller was like she was "any other day," "smiling, calm, humble" and

5

"happy." Latonya Chapple, who testified that she was close to Waller, testified that she spoke with Waller by phone about 10:00 p.m. on Valentine's Day, that Waller was "happy, she was laughing, having fun," and that she and Waller made plans to get together the next day to celebrate the birthday of Latonya's daughter.. When asked if Waller seemed depressed on Valentine's night, Bell responded, "No. Always happy. She was happy." In addition, another witness who arrived at Chapple and Waller's home about 9:30 p.m. on Valentine's Day said that she and Waller had fun making some videos that night, discussed going to work the next day, and exchanged phone numbers.

There was evidence admitted at trial that Waller and Chapple had a sometimes tumultuous relationship. One of Chapple's friends testified that Chapple and Waller argued "all the time" and that he had seen Chapple and Waller push each other. Bell added that she was aware that Chapple and Waller had arguments and conflicts. And Waller's aunt, Sonia Simmons, who was very close to Waller, testified that, during the summer of 2021, Waller called her and was

6

"crying" and "upset." Waller told her Chapple was hitting her and asked Simmons to come get her, which she did.

Agent Maddox also testified that during her search of Chapple and Waller's bedroom she found a 9mm handgun in the "bottom right-hand drawer" of a dresser and a 9mm cartridge casing on the bed. Forensic evidence showed that the cartridge casing, as well as the bullet taken from Waller's body during the autopsy, were fired from the 9mm handgun. In addition, Agent Maddox testified that Waller's black nightgown had a small circular bullet hole in it. She added that, if the gunshot that caused the defect had been a press contact or close-contact gunshot, she would have expected to see a much bigger defect in the fabric. The agent further testified that she examined Waller's black nightgown with infrared photography, explaining that she did not find any soot or stippling on Waller's nightgown, adding that this "meant that this was not a close range or contact gunshot wound, which means that it had to be further than about 18 inches" to two feet. In addition to the infrared light testing of the nightgown, Agent Maddox used a "BlueClue

7

presumptive gunpowder particle test," to search for gunpowder particles on Waller's nightgown. That test was negative. Because of the lack of "any sort of soot" and "any sort of stippling," and because the defect in the fabric was "so clean and circular," "identical" to what happened when she would shoot at "the range from three yards away," Agent Maddox concluded the gunshot to Waller's chest "was not close range," "not contact," and not "self-inflicted."

GBI Special Agent Bryan Smith did not examine Waller's black polyester nightgown for gunpowder deposits, but he testified, over Chapple's objection, that he fired a 9mm handgun into black polyester fabric while in contact with the fabric and from distances of three, six, nine, twelve, eighteen, and twenty-four inches and then examined the fabric using infrared photography to determine whether he could detect gunpowder particles, soot, or stippling in the fabric. Agent Smith testified that the contact shot created "a lot of tearing" in the fabric, which was consistent with a "contact range gunshot." He added contact gunshots were "most commonly" seen in suicide cases and that the contact gunshot did not leave "soot" on

8

the fabric because, with a contact gunshot, "there's no gap" for gases from the gunshot "to come out." He added that, as the 9mm handgun was fired farther from the fabric, the gases and soot from the gunshot dissipated and did not go into the hole in the fabric, causing a more circular hole in the fabric than the contact gunshot and leaving a "soot ring" on the fabric that grew wider and fainter with distance and disappeared entirely when the gunshot originated twenty-four inches from the fabric.

Forensic testing showed that both Waller and Chapple had gunshot residue on their hands, and the crime lab employee who conducted those tests testified that he was not surprised that gunshot residue appeared on Waller's hands, as gunshot residue can extend up to five to ten feet in the direction of the gunfire.

The medical examiner testified that the bullet that struck Waller entered the top of Waller's left chest and traveled at a downward angle about 24 inches, from left to right and front to back, lodging on the back, right side of her body. He added that he examines gunshot wounds to determine whether they were a contact

9

wound; a close-range wound, meaning that the gun is fired from just off the surface of the skin to six inches from the surface; an intermediate wound, meaning that the gun is fired from about six inches to three feet from the skin; or an indeterminate wound, where there is no evidence of any of the previous classifications. The medical examiner testified that Waller's wound was not a contact wound because there was "no searing" or "muzzle impression." There was also no evidence of a close-range wound on Waller due to the absence of soot and searing, and the wound was not an intermediate one, as there was an absence of stippling. Due to the absence of features of contact, close range, or intermediate range wounds, the medical examiner concluded that Waller's wound was of indeterminate range. In response to questioning from defense counsel, the medical examiner agreed that Waller's gunshot wound was not "immediately incapacitating"; that she would "have been able to move around a little bit after she was shot"; and that it was "possible" that Waller would have been "able to lean forward and put the gun in the drawer," explaining that she would have had

about ten seconds to do so. The medical examiner also admitted that he had seen one case in which a person shot himself and put the gun in a drawer before falling over, but he added that he had performed over 1,000 autopsies and could only give one such example. When defense counsel asked if it was reasonable to characterize this case as a suicide, the medical examiner said, it was "possible," but that his "strong concern would be the absence of any evidence of close-range firing" and that "based on [his] experience, [he] would expect to see something." Finally, the medical examiner testified that he concluded that the case was a homicide, "[b]ased primarily on the physical findings, direction of the wound track, [and] the absence of any features of close or intermediate range firing."

2. Chapple contends that the trial court improperly permitted Agent Smith to testify as an expert under the *Daubert*[2] standard and OCGA § 24-7-702(b) about his use of infrared photography to test

---

[2] See *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

black polyester fabric for gunpowder particles, soot, or stippling.[3] We conclude that the trial court did not abuse its discretion.

With the amendment of OCGA § 24-7-702 in 2022, "the General Assembly extended to criminal cases the federal standard of admissibility of expert testimony articulated in *Daubert* … and its progeny." *Arnold v. State*, 321 Ga. 434, 451 (2025) (quotation marks omitted).

> In determining the admissibility of expert testimony under the *Daubert* standard, the trial court acts as a gatekeeper, assessing both the witness qualifications to testify in a particular area of expertise and the relevancy and reliability of the proffered testimony. And the trial court examines reliability through a consideration of many factors, including whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training.

---

[3] We have recently explained that "OCGA § 24-7-702 was amended in 2022 to apply in all proceedings rather than only in all civil proceedings" and that "[w]ith that amendment … the General Assembly extended to criminal cases the federal standard of admissibility of expert testimony articulated in *Daubert* … and its progeny." *Arnold v. State*, 321 Ga. 434, 451 (2025) (quotation marks omitted).

Id. "The determination of whether a witness is qualified to render an opinion as an expert is a legal determination for the trial court and will not be disturbed absent a manifest abuse of discretion." Id. (quotation marks omitted). We conclude that the trial court did not abuse its discretion in determining that Agent Smith's testimony satisfied the requirements of *Daubert* and OCGA § 24-7-702(b).

Before trial, the State notified Chapple that it would seek to introduce expert testimony through Agent Smith related to the use of infrared photography to detect gunshot soot, particles, and residue on black polyester clothing, like the nightgown worn by Waller at the time of her death. Chapple moved to exclude the testimony, and the trial court held a pre-trial hearing on the matter.

At that hearing, Agent Smith testified that he had extensively studied the use of infrared light sources, that he has taught others at the GBI to use infrared and alternate light sources, and that he had conducted "at least 80 to 100 infrared light source examinations of evidence." He explained the technique for using infrared lighting

13

to discover gunpowder deposits, said that it is the primary tool for examining "dark-colored fabrics for gunpowder deposits," and added that the technique he uses is the one used by others in the field. Agent Smith testified that "there's a wealth of research on infrared light sources being used to identify gunpowder deposits and blood going probably back to the mid '80s at least"; that he stayed current "with those peer reviews and publications"; and that the work that he did in this case was "consistent with the publications and research." According to Smith, the GBI had used infrared lighting on denim and cotton fabric but had not used infrared lighting on polyester fabric. Agent Smith testified that "there's no doubt that gunpowder particles, whether it's on polyester, cotton, metal, whatever, will still absorb light." He explained that infrared photography washes out dark materials so that the material looks white and that "[i]t was just a question of whether polyester would absorb light, or refract light, or reflect light" to create a washed out background on which he could see the gunpowder particles. He added that his experiment showed that polyester "did absorb light

14

to wash out the background and look almost white or gray like cotton and other substances." Smith added that the technique he used to conduct those tests was generally accepted within the scientific community and that his experiments were in line with best practices in the field of study and nationally accepted.

In denying Chapple's motion in limine, the trial court found that, "following the analysis of [Rule] 702 as it's amplified by *Daubert*," Agent Smith's testimony was relevant and reliable; that his "scientific or technical knowledge is going to help the trier of fact understand the evidence at issue"; and "that the testimony will be based on sufficient facts or data," as "[t]his appears to be an empirical test based on the science as it has been applied routinely in this area." The court also explained

> that Agent Smith's testimony appears to be based on … sufficient facts or data that he was able to discern based on his learnings as well as the ones he collected himself. That testimony that is presented appears to be the product of reliable principles and methods. As I said earlier, this area of inquiry, this discipline appears to be settled and clear. Finally, the expert appears to have reliably applied the principles to the facts of this case, or at least to a limited subset of facts in this case, which

15

could be relevant or helpful to the trier of fact.

The trial court's ruling demonstrates that "it applied the applicable standard in this case, assessing both the witness's qualifications to testify in a particular area of expertise and the relevancy and reliability of the proffered testimony." *Arnold*, 321 Ga. at 453 (quotation marks and punctuation omitted).[4] Chapple contends, however, that the trial court abused its discretion in permitting Agent Smith's testimony, contending that the evidence at the hearing showed that his testimony was unreliable because he had not used infrared photography on polyester fabric to identify soot, stippling, and gunpowder residue. However, based on Agent Smith's

---

[4] Chapple also enumerates as error that the trial court applied the former standard set forth in *Harper v. State*, 249 Ga. 519 (1982), for determining the admissibility of scientific evidence, instead of the current standard of *Daubert* and OCGA § 24-7-702(b). Chapple bases this claim on a statement by the trial court at the hearing on the motion in limine regarding whether *Harper* or *Daubert* was the more lenient standard. However, as the above discussion illustrates, the trial court correctly applied *Daubert* and OCGA § 24-7-702(b) in this case. See *Garrison v. State*, 319 Ga. 711, 725–26 (2024) (explaining "that we appear not yet to have expressly analyzed the extent to which the *Daubert* standard and the former *Harper* standard differ" and declining to analyze the differences in the standards in that case, "other than to clarify that they are not the same"). Accordingly, this separate enumeration lacks merit.

testimony that infrared photography is designed to wash out colors so that dark materials look white and that his experiment was conducted according to best practices in the field and nationally accepted standards, we conclude that the trial court did not abuse its discretion in finding that Agent Smith's testimony was reliable. Moreover, contrary to Chapple's contention, although Agent Smith did not conduct his tests with the murder weapon and a piece of fabric from the victim's polyester nightgown, the test was nevertheless adjusted to the facts of this case, which involved a fatal gunshot wound with a 9mm handgun through a black polyester nightgown. Again, we conclude that the trial court did not abuse its discretion in admitting Agent Smith's testimony under *Daubert* and OCGA § 24-7-702(b). See *Arnold*, 321 Ga. at 452-453 (concluding that the trial court applied the correct standard in assessing an expert's qualifications to testify and thus did not abuse its discretion in admitting the testimony).

3. Chapple contends that the trial court erred by overruling his continuing witness objection and permitting three crime lab reports

17

to go out with the deliberating jury. More specifically, he contends that the court erred in sending out the two reports from the GBI concluding that samples from the hands of Chapple and Waller contained gunshot residue and the GBI firearms report concluding that the 9mm bullet recovered from Waller and the cartridge casing found on the victim's bed were fired from the 9mm handgun found in the dresser. We conclude that the trial court did not err.

The continuing witness rule "regulates which documents or recordings go into the jury room with the jury during deliberations and which ones do not." *Lofton v. State*, 310 Ga. 770, 785 (2021) (quotation marks omitted), disapproved in part on other grounds by *Outlaw v. State*, 311 Ga. 396, 401 n.5 (2021). We have explained that "the continuing witness rule is directed at written testimony that is heard by the jury when read from the witness stand," pointing out that "[t]he rule is based on the principle that it is unfair and places undue emphasis on written testimony that has been read to the jury for the writing to be sent out with the jury to be read again during deliberations whereas oral testimony is received by the jury only

once." *Muse v. State*, 316 Ga. 639, 659 (2023) (quotation marks omitted). We have noted that "[t]he types of documents that have been held subject to the rule include affidavits, depositions, written confessions, statements, and dying declarations." *Lofton*, 310 Ga. at 786.

Here, the crime lab reports in question "w[ere] not written testimony and did not derive [their] evidentiary value solely from the credibility of its maker." *Robinson v. State*, 308 Ga. 543, 553 (2020). Instead, the reports were "original documentary evidence, and w[ere] properly allowed to go out with the jury." Id. (holding that a letter written by a fellow inmate of the defendant that said that the defendant had told him about the crimes was original documentary evidence"). See also *Adams v. State*, 284 Ga. App. 534, 536-537 (2007) (holding that it did not violate the continuing witness rule to allow a blood test report from the crime lab to go out with the jury, as the report was "direct evidence of the manner in which a scientific test was conducted and of the results thereby obtained" and that "[t]he proscription on the jury's possession of written

19

testimony does not extend to documents which are themselves relevant and admissible as original documentary evidence in a case" (quotation marks omitted)); *Tanner v. State*, 259 Ga. App. 94, 98 (2003) (same).

Chapple relies on *Roberts v. State*, 282 Ga. 548, 552 (2007), to argue that the crime lab reports in this case could not go out with the jury as original documentary evidence. But *Roberts* involved a report of a documents examiner that summarily said that a test had been conducted and the opinion of the examiner. We concluded that the report therefore did not "amount to evidence of the manner in which a test was conducted and does not make the document original documentary evidence." Id. at 552–53. Here, in contrast to *Roberts*, the crime lab reports stated the types of scientific tests conducted and the results of the tests and did not contain an opinion of the person conducting the test. For example, the gunshot residue reports say that the samples from the hands of Chapple and Waller were "examined by scanning electron microscopy/energy dispersive spectroscopy … and analyzed for elemental composition and particle

morphology" for gunshot residue particles; that such particles "are single, discrete, microscopic particles, molten in morphology, that contain the elements lea, barium, and antimony"; and that gunshot residue particles were found in the samples. We conclude that the reports in this case were original documentary evidence that the trial court properly allowed to go out with the jury.

4. Chapple contends that trial counsel was constitutionally ineffective in several respects. We disagree.

To prevail on a claim of ineffective assistance, a defendant must prove both that the performance of his lawyer was deficient and that he was prejudiced by counsel's deficient performance. *Strickland v. Washington*, 466 US 668, 687 (1984). To satisfy the deficiency prong of the *Strickland* test, the defendant "must show that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Lofton v. State*, 309 Ga. 349, 360 (2020). "This requires a defendant to overcome the strong presumption that counsel's performance fell within a wide range of reasonable

21

professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." *Scott v. State*, 306 Ga. 417, 419–20 (2019) (quotation marks omitted). "Decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Thomas v. State*, 311 Ga. 706, 714 (2021) (quotation marks omitted). The defendant must also show that the deficient performance prejudiced the defense, which requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 US at 694. If an appellant "fails to meet his burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Williams v. State*, 315 Ga. 797, 806 (2023).

(a) Chapple first claims that trial counsel was constitutionally ineffective by failing to object to testimony of Agent Maddox that amounted to improper character evidence.

At trial, when defense counsel was questioning Agent Maddox

about the thoroughness of her search of Chapple and Waller's bedroom, the agent said that she collected "pertinent information." Defense counsel asked whether that included anything with "the person's name" on it. Agent Maddox responded that "it includes the person's name, it can be things of evidentiary value like the Gangster Disciple drawing that was on top of the night stand. It could also include the suitcase of marijuana that was found in the back yard." Defense counsel did not object to this testimony or ask for it to be struck.

We conclude that Chapple has failed to show that trial counsel performed deficiently by failing to move to strike Agent Maddox's testimony. Trial counsel testified at the motion for new trial hearing that his general trial strategy was not to draw attention to prejudicial matters. Although he did not "think" or "believe" that he engaged in that analysis with regard to the Gangster Disciple testimony, that is not controlling, because "if a reasonable lawyer might have done what the actual lawyer did—whether for the same reasons given by the actual lawyer or different reasons entirely—

the actual lawyer cannot be said to have performed in an objectively unreasonable way." *Scott v. State*, 317 Ga. 218, 223 (2023) (punctuation and quotation marks omitted). Here, an objection to Agent Maddox's testimony could have drawn more attention to the alleged prejudicial matter, so not moving to strike the testimony was not objectively unreasonable and did not constitute deficient performance. See *Scott*, 317 Ga. at 224 (holding that trial counsel's choice not to draw further attention to a prejudicial matter could have been objectively reasonable and strategic and was not deficient performance, even though counsel did not have a strategic reason for not requesting a limiting instruction on the matter).

Moreover, with regard to Agent Maddox's statement about finding marijuana in the backyard, trial counsel testified at the motion for new trial hearing that he had a strategic reason for not moving to strike that testimony, explaining that he could use the marijuana testimony to attack the credibility of the GBI agents, if he needed to, on the ground that "they couldn't even prove, you know, what was going on with suitcases of marijuana sitting right

24

outside the property line." "The matter of when and how to raise objections is generally a matter of trial strategy," *Tyson v. State*, 312 Ga. 585, 599 (2021), and here, we cannot conclude that Chapple has shown that counsel's decision to forgo an objection "was so patently unreasonable that no competent lawyer would have made the same decision." Id. (holding that counsel's strategic decision not to object to allegedly improper character evidence was not patently unreasonable and not deficient performance) (quotation marks omitted).

(b) Chapple next contends that the search warrant for Chapple and Waller's home was not supported by probable cause and that trial counsel was constitutionally ineffective in failing to move to suppress the 9 mm handgun found pursuant to the search warrant.

"When we evaluate a claim that counsel was deficient for failing to file a motion to suppress, we ask whether a motion to suppress on the specific basis proposed by the appellant would clearly have succeeded if counsel had raised it." *Moss v. State*, 322 Ga. 757, 767 (2025) (quotation marks omitted). "In determining

25

whether probable cause exists to issue a search warrant, the magistrate's task is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Copeland v. State*, 314 Ga. 44, 49 (2022) (quotation marks omitted). Moreover, "the test for probable cause is not a hypertechnical one to be employed by legal technicians, but is based on the factual and practical considerations of everyday life on which reasonable and prudent men act." *State v. Britton*, 316 Ga. 283, 286–87 (2023) (punctuation and quotation marks omitted). "On appellate review, our duty is to determine if the magistrate had a 'substantial basis' for concluding that probable cause existed to issue the search warrant," and the magistrate's decision "to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court, and even doubtful cases should be resolved in favor of upholding a magistrate's determination that a warrant is proper." *Copeland*, 314 Ga. at 49 (punctuation and

26

quotation marks omitted).

Here, Chapple argues that the handgun was subject to suppression because the affidavit failed to establish a "probable cause nexus" between the handgun and the house. Chapple's claim of ineffective assistance fails because a motion to suppress on this ground would not clearly have succeeded. In the warrant affidavit, a detective with the Baldwin County Sheriff's Office said that he responded to the scene of the crimes on the night of the shooting, that the address he responded to was Waller and Chapple's residence, that Waller had died from a gunshot wound suffered at the couple's home on the night of the crimes, that Chapple was in the house on the night of the crimes and told another person in the house that Waller had been shot, that the person then saw Chapple leave the house, and that the person returned to the house, finding Waller lying on the floor. Given these circumstances, if trial counsel had filed a motion to suppress on the ground now asserted by Chapple, the magistrate reviewing the warrant would have been authorized to conclude that there was a fair probability that

incriminating evidence, including the handgun, would be found at Chapple and Waller's house. See *Prince v. State*, 295 Ga. 788, 792-93 (2014) (holding that probable cause to search the defendant's house was established by information in the affidavit that the victim had been found beaten to death, that items belonging to the defendant's girlfriend had been found near the victim's body, that the defendant and his girlfriend fled to Florida when they learned that they were wanted for questioning, and that the girlfriend told investigators that she was with the defendant on the night of the murders and let him use her van that night). Because Chapple has not established that a motion to suppress would have been successful, this claim of ineffective assistance of counsel fails. See *Moss*, 322 Ga. at 767–68; *Prince*, 295 Ga. at 793.

(c) Finally, Chapple contends that the cumulative effect of trial court errors and trial counsel deficiencies requires his convictions to be reversed. But, as explained above, Chapple has failed to establish any trial court errors or instances in which trial counsel was professionally deficient. For this reason, "there are no errors to

aggregate, and his claim of cumulative error also fails." *Blocker v. State*, 316 Ga. 568, 583 (2023) (quotation marks omitted).

*Judgment affirmed. All the Justices concur.*